IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA    )
                                )
                                )      Criminal No.  2:13-CR-09-WCO-JCF
V.                                 )
                                )
                                )
MICHAEL CANNON II         )

## POST-HEARING BRIEF IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS

NOW COMES MICHAEL CANNON II ("Michael Cannon or Mr. Cannon") and files this post-hearing brief in support of his motion to suppress statements (Doc. 11).

## I.   PRELIMINARY STATEMENT

Mr. Cannon filed a motion to suppress the statements he gave during a February 7, 2013 search of his home at which time he was interviewed by two Department of Homeland Security special agents concerning a federal child pornography investigation.  Mr. Cannon seeks to suppress his statements as being the product of custodial interrogation because, after law enforcement entered the home by force, he was effectively under arrest and then interrogated without having received notice of his <u>Miranda</u> warnings.  In addition, Mr. Cannon seeks to suppress his statements as being the product of an otherwise coercive environment.  In

particular, Mr. Cannon was badgered, harassed, threatened with arrest, accused of lying, and lied to by federal agents.   Consequently, his statements were not voluntarily and intelligently made and should be suppressed.

## II.   FACTS

On February 4, 2013, Department of Homeland Security (DHS) Special Agent Jeffrey C. Robeson obtained a federal search warrant for 2675 Lee Land Road, Gainesville, Georgia.   The warrant was based upon information connecting a potential internet-based child pornography image to the residence through an ISP address.  In the pre-dawn hours of February 7, 2013, federal agents executed a search warrant at the home.

### A.   The Agents Forced Entry.

At approximately 6:50 a.m., a total of thirteen federal and local agents stood poised to raid the home, which is isolated at the end of a cul-de-sac. (Tr. 5-7; Gov Exs. 3-4).  It was pre-dawn and still dark. (Tr. 21).  Eight federal agents lined up in a "stack" at the front door. (Tr. 24-26, 37).  Each wore tactical gear, including vests marked "police," and possessed a sidearm, which was drawn. (Tr. 9, 37).  Two agents were wielding semi-automatic assault rifles with stock-mounted flashlights which were slung over their shoulders on straps and trained on the home at entry. (Id.).  A marked squad car from the local sheriff's office was parked out in front of the house

"in case the residents look out the window." (Tr. 6).

Special Agent Robeson was at the front of the eight-man stack. (Tr. 8-9).  Once the stack reached the front door, the local sheriff's cruiser turned on his blue lights. (Tr. 6).  Robeson banged on the front door and yelled "police, open up, we have a search warrant." (Tr. 9).  The local sheriff's cruiser blew an air horn. (Tr. 6-7).  Mr. Cannon's father, Scott Cannon came to the door and asked "Who is it?" (Tr. 10).  Robeson again shouted "police," commanded him to open the door, and yelled that he had a search warrant. (Id.).  Scott Cannon indicated that he was unable to open the door. (Tr. 10, 30).  Robeson stated that he saw a figure walk away from the door. (Id.).  Seconds later, Robeson and the eight-man stack, using a steel ram, crushed the door open, ripping it out of its frame. (Id.; Gov Ex. 6).

### B.    The Sweep of the Home and Detention of All Residents.

Eight DHS agents flooded the home with guns in the ready position. Immediately inside the front door, agents found Scott Cannon. (Tr. 13).  He was seized, taken to the ground prostrate, and his arms handcuffed behind his back. (Tr. 13, 33. 107).  He was then moved to the kitchen table just inside the front entrance of the home to the left with his hands still cuffed. (Tr. 18, 35).  Robeson also located three-year-old Max, Mr. Cannon's son, in the living room area just past the kitchen. (Tr. 14, 32-35).  Robeson stayed with him for approximately five minutes and then

Max was taken to Connie Cannon's bedroom. (Tr. 35).   Connie Cannon, Scott Cannon's wife, was found in her bedroom, which is located down a hall to the left of the front entrance. (Tr. 14).   Connie Cannon is paralyzed and bedridden, the result of a stroke. (Tr. 14, 107).   There was an armed guard with her the entire time. (Tr. 36).

Armed agents in battle dress uniform filtered through the entire two-level house room-by-room.   While SA Robeson and others encountered Connie and Scott Cannon and Max on the main level, "several" armed agents proceeded to the basement of the home. (Tr. 14).   The basement stairs are through a door outside of Connie Cannon's bedroom at the end of the long hallway which extends left from the main entrance to the home. (Tr. 33).   According to SA Robeson, DHS Special Agents Rob Roy, Mike Ashley, and Ty Harris went to the basement but there could have been more agents. (Tr. 39, 44).   Rob Roy was wielding an M-4 semiautomatic assault rifle. (Tr. 38).   All agents were armed with their guns drawn. (Tr. 43-44).

The basement is unfinished, with raw studs and framed-but-unfinished areas breaking up one large concrete and cinder block room. (Tr. 40).   It is below ground and dark. (Id.).   The stairs from the main level plunge into the basement and open up at the bottom, leaving the entire room to the left. (Tr. 40-42).   Walking the length of the room, two unfinished but fully-framed rooms appear to the left, the second of which is shared by Maddy (10) and Icy (3), Mr. Cannon's daughters. (Id.).   Michael

4

Cannon's room, the closest to being "finished," is at the end. (Id.; See Exhibit A, photos of basement).[1]

SA Anthony Scott assisted in clearing the home and, in particular, the basement. (Tr. 66). He recalled that there were others who went to the basement and that he followed them down the stairs. (Tr. 67, 78). SA Scott recalled very little from that day, but did remember that he swept Maddy's room, training his gun on the crib and small bed he saw within. (Tr. 78-80). He did not recall encountering anyone in the room, including three year old Icy, who was in her crib. (Tr. 79, 16). SA Scott indicated that there were no windows in Maddy's room. (Tr. 79-80). When he left Maddy's room, SA Scott saw Maddy and Michael Cannon in the main basement area. Other agents had seized Mr. Cannon and his arms were handcuffed behind his back. (Tr. 81-82).

SA Robeson explained that Michael Cannon was found in a closet in his room at the end of the basement. (Tr. 15, 40).[2] He later learned that Maddy ran to her father's room from her bedroom after the agents entered. (Tr. 43). A number of

_____

[1] It was discussed that counsel could append such pictures to his motion at the suppression hearing. Exhibit A will be filed separately and provided to the government with a courtesy copy.

[2] SA Robeson explained that he was not in the basement but knew what happened there from talking to SA Mike Ashley, who cuffed Mr. Cannon and remained with him in the basement. (Tr. 15, 29, 39-40, 45).

armed agents swarmed the basement and found Mr. Cannon and Maddy hiding in his closet. (Tr. 15-16).   Agents, with guns pointed at him and Maddy, ordered Mr. Cannon to show his hands. (Tr. 15, 44).   They ordered him to walk out of the closet. (Id.).   He complied. (Tr. 42-44).   Maddy followed. (Id.).   Mr. Cannon was then handcuffed. (Id.).   The two girls were separated from their father and taken upstairs to Connie Cannon's room. (Tr. 16, 47-48).

It is unclear how long Mr. Cannon remained cuffed in the basement by himself with a number of federal agents. (Tr. 45).   According to SA Robeson, he remained in the basement with SA Mike Ashley "for a short time" and was eventually brought upstairs. (Tr. 45-46).   SA Robeson estimated that Mr. Cannon was handcuffed for 15-20 minutes. (Tr. 45).   Ultimately, Mr. Cannon was escorted upstairs by an armed agent and positioned at the kitchen table with his father Scott Cannon. (Tr. 46, 48). Scott Cannon was guarded by an armed agent prior to and after Mr. Cannon's arrival. (Tr. 48).   The agent was standing. (Tr. 58).

At some point, SA Robeson obtained a copy of the search warrant and approached Scott and Michael Cannon at the kitchen table. (Tr.18, 49-50).   He explained that the warrant pertained to a child exploitation investigation involving Maddy. (Tr. at 50).   He then walked to Connie Cannon's room, leaving Michael and Scott Cannon with armed agents guarding them. (Tr. 50-51).   Michael Cannon was

6

told that he could not freely move around the house while agents were searching. (Tr. 19, 52).  Agents departed the house at 11:00 a.m. (Tr. 52).  Mr. Cannon was never told when the agents were done searching. (Tr. 53).

### C.   The First Interrogation Session of Michael Cannon.

SA Robeson estimated that Mr. Cannon was taken down to the basement for interrogation "within 30 minutes of the house being cleared." (Tr. 53).  SA Westall estimated no more than 10 minutes. (Tr. 109).  He was escorted to the basement from the kitchen table. (Tr. 53).  Mr. Cannon was attended by standing, armed federal agents the entire time prior to being escorted to the basement. (Tr. 54, 58).

SA David Westall escorted Mr. Cannon to the basement for interrogation. (Tr. 53).  SA Westall had an M-4 semi automatic assault rifle during the sweep. (Tr. 51, 68, 108).  Prior to seizing Mr. Cannon and escorting him to the basement for interrogation, he could be seen walking around the house with the assault rifle slung over his shoulder. (Tr. 51).  He put it away, however, prior to interrogation. (Tr. 52, 109). SA Scott joined SA Westall for the interrogation, which occurred in Maddy's unfinished, windowless bedroom below ground in the basement, away from everyone else in the house. (Tr. 83).

The first interrogation lasted 25 minutes and 13 seconds; it was recorded. (Def's Ex. 1, audio CD).  Mr. Cannon was sitting on a bed in Maddy's room which

ran along the shared wall with the main basement room. (Tr. 80, 87-88, 110). Across from him stood Agents Westall and Scott, who flanked him to the left and right. (Tr. 69, 110). The small room was approximately 15 feet by 15 feet; there were no windows. (Tr. 67, 79). The agents wore holstered sidearms. (Tr. 68). They stood during the interview. (Tr. 87-88).

After SA Scott obtained certain background information, Agent Westall advised Mr. Cannon that he was not under arrest and that he was free to leave. (Def Ex. 1, Michael Cannon II Interview, Time Stamp 2:17-2:50). Through nervous laughter, Mr. Cannon recognized his reality, saying "Yeah, but I don't have anywhere to go." (Id. at 2:38-2:44). It was early in the morning and Mr. Cannon was likely in a state of partial undress. He had been handcuffed, under constant armed watch, and escorted everywhere agents chose to take him. He was advised, "you can talk or not talk or whatever." (Id. at 3:01-3:08). Agent Scott then advised that they were with Department of Homeland Security and that they were there to investigate images relating to Mr. Cannon's daughter Maddy, whom the agents believed to be in danger. (Id. at 3:26-4:12). Rather than exercise his "option" to leave his three minor children and family, he agreed to speak with the agents.

It became apparent from the outset that the agents were accusing Mr. Cannon of taking the pictures. They began by asking him about his email addresses, internet

activity, and whether he was familiar with the user name "Madslove." (Id. at 4:15-5:30).  They then showed him a four images of the ten year old female which were obtained from the Russian-based website. (Id. at  7:12-8:51).  Unlike the others, the fourth picture involved partial nudity of Maddy (Id. at 8:27; Def Ex. 8).

Agents proceeded to ask Mr. Cannon no less than four times in a two-minute span who took the fourth picture; he responded that he did not and did not know who took it. (Id. at 8:27-10:09).[3]  SA Westall asked Mr. Cannon if he was positive; Mr. Cannon said yes. (Id.).  SA Westall then asked if Mr. Cannon would take a polygraph test "this morning" concerning his denial. (Id. at 10:10-24).  He immediately agreed and asked about his rights and the accuracy of the test. (Id.).  SA Westall said, "You don't have to take one." (Id.).  Mr. Cannon replied, "Are they one-hundred percent?" (Id.).  SA Westall then instructed Mr. Cannon, "It would clear you in my mind if you tell me that you didn't take the picture and you pass a polygraph." (Id. at 10:24-10:33).  Mr. Cannon responded, "I'll take it." (Id. at 10:32-33).

The agents did not stop there.  They did not, however, follow through with this vacant promise of a polygraph to "clear" him.  Rather, for the next fifteen minutes,

---

[3]  Agent Scott asked Mr. Cannon again about Madslove and imgsrc.ru.  Mr. Cannon denied knowledge. (Id. at 9:01-9:14).  Agent Scott responded, "You don't know *anything* about that," his tone clearly suggesting that he believed Mr. Cannon was lying. (Id. at 9:14).

the agents continued to ask Mr. Cannon who took the picture, accusing him of lying and threatening to expose his lie in various ways. (Id. at 10:34-25:10).  The agents explained that on-site computer forensic examiners were reviewing every computer in the home. (Id. at 10:50-11:22).  They said that this on-site forensic review would reveal, in the next 10 to 25 minutes, all of the images on the computer devices and the email addresses accessed by all electronic devices. (Id. at 12:12-14:00).  SA Scott explained, "if this shows up and its not your dad, then we have a problem." (Id. at 12:12-12:25).  SA Scott did not expand on what precisely the "problem" would be but the clear implication was Mr. Cannon's formal arrest.

Notably, Mr. Cannon raised the issue of a polygraph *three* more times during the first interview in response to the agents' accusations, continuing to believe that his cooperation and conversation with the agents would clear him based upon SA Westall's earlier promise of exoneration.  Both agents remarked cynically about the "huge coincidence" that Mr. Cannon's World of Warcraft character shared naming aspects with the email address investigators connected to the Russian website where the images were found. (Id. at 11:32-12:00).[4]  Mr. Cannon stated, "I'll take a damn, like you said, I get a polygraph on, I'll take a polygraph." (Id. at 12:00-12:05).  In

---

[4]   SA Scott testified that he believed that Mr. Cannon was lying about his knowledge of the email address. (Tr. 90-92).

response to repetitive questioning about who took the picture, Mr. Cannon repeated, "get the polygraph." (Id. at 14:18-14:38).  At the end of the first interrogation session, before asking to smoke, Mr. Cannon remarked, "Do you need me to take that polygraph test this morning?" (Id. at 25:08).  SA Westall remarked, "We may very well.  Let's see what Maddy says and see who Maddy says took those pictures of her." (Id. at 25:11-25:18).

### D.   The Detention of Michael Cannon In Between Interrogations.

Mr. Cannon was escorted upstairs by SA Westall and SA Scott. (Tr. 133, 92-94).[5]  Mr. Cannon was passed off to another agent who eventually took him outside to smoke. (Id.).   He was guarded while he smoked and then immediately escorted back to the kitchen table and guarded there by standing armed agents. (Tr. 57-58).  Mr. Cannon sat under armed watch at the kitchen table for 45 minutes to 1 hour while SA Westall and SA Scott interviewed Scott Cannon and Maddy. (Tr. 133, 95).  He was then escorted back downstairs for a second interrogation. (Tr. 59, 96).  Agents denied that Mr. Cannon, while upstairs, asked to leave but was prevented from doing so. (Tr. 57, 136-37).

---

[5]  SA Westall stated that he brought Mr. Cannon up to the living room, which was adjacent to the kitchen area. (Tr. 133).  However, the kitchen was open to the living room.  SA Scott testified that he and SA Westall left Mr. Cannon at the kitchen table. (Tr. 92-94).  Agent Robeson confirmed he was placed at the kitchen table (Tr. 57).

### E.     The Second Interrogation Session of Michael Cannon.

At 9:10 a.m., two hours and twenty minutes after entry, SA Westall and SA Scott interrogated Mr. Cannon a second time in the same windowless basement room. They were still wearing side arms and stood flanking Mr. Cannon as he sat on Maddy's bed answering their questions. (Tr. 134).   This interrogation lasted 16 minutes and 10 seconds. (Def Ex. 1, Michael Cannon II followup interview).  Prior to questioning, SA Westall stated that Mr. Cannon was free, not under arrest, and that he could leave at any time:  "You can walk out the house, you don't have to say anything." (Def Ex. 1, Time Stamp 00:13-00:22).  Mr. Cannon responded: "I said that to the other agent and he wouldn't let me go. All I wanted was a smoke." (Id. at 00:22-00:30).  SA Westall followed up and asked, "Has anyone forced you to do anything that you don't want to do?" (Id. at 00:45-00:47).  Mr. Cannon replied, "to sit there but that was it," then he uncomfortably back tracked to say "no, no, nobody's forced me to do anything." (Id. at 00:47-1:02).

Mr. Cannon did not feel free to go and the agents had no intention of allowing him to leave; they planned to re-interrogate him following interviews with his father and Maddy.  SA Westall began the interview by stating, "We talked to Maddy and we kind of got some information that is concerning to us." (Id. at 1:02-1:12).  SA Westall did not reveal to Mr. Cannon what that information was. (Tr. 137-38).  SA Westall

never told Mr. Cannon that Maddy exculpated him by stating that Mr. Cannon did not take the photos and that the photos were taken by someone else. (Tr. 139).

The tone of the interview was decidedly more hostile and accusatory towards Mr. Cannon.  In a tirade, SA Westall directly accused Mr. Cannon of taking the photos, setting up the email address that linked to the website and trading images of his daughter.  He stated: "The problem we're having is fricking the gmail account that's used to access that – the one we're getting a search warrant for now – is your fricking address.  Lichbacterial, that's you." (Id. at 2:31-2:48).  No one had applied for a search warrant for the gmail account at issue until February 27, 2013, weeks after the execution of the search warrant. (Def Ex. 5).  Mr. Cannon denied the accusations. (Id. at 2:48-3:14).

SA Westall continued his accusations, arguing against any other possibility other than Mr. Cannon's guilt and characterizing Mr. Cannon's cooperation as "half-ass answers and game playing." (Id. at 3:14-6:10).  Berating Mr. Cannon, SA Westall chided, "Look here dude.  I'm telling you this.  You've had your opportunity.  You've had your opportunity.  You've had your opportunity.  When I fricking pin this thing to you cause it comes back to this address." (Id. at 6:10-6:17).  Thrusting a photo at Mr. Cannon, SA Westall questioned Mr. Cannon's concern for his daughter based upon his reaction to the image. (Id. at 6:59-7:39).  He scolded Mr. Cannon, barking

13

"What did you do with these images?  How many are there?"  and insisting "You know about these.  You've seen these before."  Mr. Cannon continued to deny knowledge of the images or wrongdoing. (Id.).

Unhappy with Mr. Cannon's responses, SA Westall threatened to arrest Mr. Cannon:  "You've had your chance man.  Tell me what you've got for this guy. When we pin it back to a MAC address, we pin it back to you, I'm coming with the thunder.  You better know that.  Time is coming.  Time is coming." (Id. at 7:38-7:55). Tellingly, Mr. Cannon immediately raises the polygraph test to exonerate himself, the very option planted by SA Westall. (Id. at 7:55-8:51).   Remarkably, SA Westall denied that Mr. Cannon even agreed to take the polygraph. (Id.).  SA Westall repeated his threat, "I'll tell you what, I'm telling you what, when we come back when we come back, I'm coming with the thunder." (Id. 8:43-8:51).  SA Westall admitted that, by "coming with the thunder," he meant coming to arrest Mr. Cannon. (Tr. 143-46). SA Westall admitted that what he meant was that when forensics matched the email address associated with the website to a device in the house, he would arrest Mr. Cannon. (Tr. 143-144).   Agents had told Mr. Cannon that forensic agents were working in the house and would have results within minutes.

At the end of the second interrogation, SA Westall repeated his early promise to Mr. Cannon that he could "clear" himself with a polygraph test. (Def Ex. 1,

Michael Cannon II followup interview, Time Stamp 13:36-14:55). He reiterated that, if he passed, "it would definitely focus our attention someplace else." (Id.). SA Westall went so far as to make a "deal" with Mr. Cannon regarding the polygraph, "man to man." (Id. at 14:50-14:52). SA Westall dangled the polygraph test as a way out from the very beginning. SA Westall testified that he had the authority to promise Mr. Cannon that he would be cleared. (Tr. 146).

III.   **ARGUMENT**

    A.   **The Issue: Was Mr. Cannon in "Custody" for Purposes of <u>Miranda</u>?**

Statements that are the product of custodial interrogation without <u>Miranda</u> warnings must be suppressed. <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966); <u>Oregon v. Elstad</u>, 470 U.S. 298, 307 (1985) (violation of <u>Miranda</u> presumptively coercive and statements subject to suppression). It is uncontested that Mr. Cannon was interrogated twice. It is also uncontested that <u>Miranda</u> warnings were not administered. Therefore, the only issue for the Court is whether Mr. Cannon's detention for up to five hours at the hands of numerous armed federal agents constituted restraint to a degree associated with a formal arrest.

The test is whether a reasonably innocent person in Mr. Cannon's position "would have felt his freedom of action to have been curtailed to a degree associated

with formal arrest." United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2011) (citation omitted); United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006).[6]  It is a factual inquiry considering the totality of circumstances. Id.  The government bears the "heavy burden" of proving that the statements given by Mr. Cannon complied with Miranda and were otherwise voluntary. Miranda, supra.; United States v. Bailey, 468 F.2d 652, 659-60 (5th Cir. 1972).

> **B.      Agents Westall and Scott Interrogated Mr. Cannon in a Setting So Dominated by Law Enforcement Officers That Mr. Cannon Found Himself in Custody Within His Own Home.**

Miranda applies to any interrogation in any setting, including a suspect's own home, where the atmosphere is "police dominated." Berkemer v. McCarty, 468 U.S. 420, 439 (1984).  The Court must apply an objective test to this inquiry:  "The only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000) (quoting Berkemer, 468 U.S. at 442).  A court must determine whether "a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave." Howes v. Fields, 132 S. Ct. 1181, 1189 (2012).  Courts look

---

[6]  This test is narrower than the so-called "free to leave" inquiry. United States v. Acosta, 363 F.3d 1141, 1149 (11th Cir. 2004).  It is not enough to say that the suspect is temporarily detained; more is required. Brown, 441 F.3d at 1347.

to "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010) (quoting Yarborough v. Alvarado, 541 U.S. 652, 663 (2004)). A court must determine whether the circumstances "involve the type of 'highly intrusive' coercive atmosphere that may require Miranda warnings even before a formal arrest is made." United States v. Acosta, 363 F.3d 1141, 1150 (11th Cir. 2004); see United States v. Craighead, 539 F.3d 1073, 1083 (9th Cir. 2008) (finding suspect to be in custody even in his own home if he endures a "police-dominated atmosphere").

The totality of circumstances test is limited only by one's imagination, but courts have provided a lengthy list of non-exhaustive factors. A court should consider the location of the questioning, as well as the duration of questioning, statements made during the interview, the presence of physical restraints during questioning, and the release of the suspect at the end of the interrogation. Howes, 132 S. Ct. at 1189. A reviewing court shall ask whether law enforcement officers unambiguously told the suspect he was free to leave and that he was not in custody. Brown, 441 F.3d at 1348. The Eleventh Circuit also asks lower courts to evaluate "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicted that compliance with the officers could by compelled." United

17

States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006).  Other circuit courts have

identified many other factors, including the number of law enforcement personnel and

whether they were armed; whether the suspect was at any point restrained, either by

physical force or by threats; and whether the suspect was isolated from others. See,

e.g., Craighead, 539 F.3d at 1084 & n.3.

As it evaluates the interrogation of Mr. Cannon, this Court ought to weave each

of these factors into the fabric of Mr. Cannon's case.  In the end, the tapestry will

reveal that although Mr. Cannon was within the walls of his own home, that home

was overrun with agents who thoroughly dominated him and his family.

### 1.    A "Home" Environment Can Still Be Custodial.

The Eleventh Circuit has noted that "courts are much less likely to find the

circumstances custodial when the interrogation occurs in familiar or at least neutral

surroundings, such as the suspect's own home," a site which is "on his own turf."

Brown, 441 F.3d at 1348.[7]  However, the home setting alone does not eliminate a

---

[7]   Although Brown himself was interrogated in the familiar setting of his girlfriend's home, the Eleventh Circuit's conclusion that he was not in custody was based more heavily upon other factors which differ greatly from those of Mr. Cannon's case.  For example, Brown answered the agents' questions in an open dining room and living room until he asked to move to a more private space, the interviewing officers were not armed, Brown was never physically restrained at all, he was permitted to use the phone, and he moved freely about the house. 441 F.3d at 1349.

custodial environment.[8]  The Supreme Court itself has found an interrogation within a man's own bedroom — on his very own bed no less — to be custodial. <u>Orozco v. Texas</u>, 394 U.S. 324, 326 (1969).  In many ways, an invasion by law enforcement agents into a man's home is the most personal of violations.  A man's home can hardly be seen as a place of comfort and familiarity when it has been overrun by armed strangers who order and direct a man's every move within his own walls.  The circumstances in a given interrogation may "turn[] the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere.'" <u>Craighead</u>, 539 F.3d at 1083.  Even in a suspect's own home, he may be "deprived of his freedom of action in [a] significant way," similar to an interview at a police station, where a suspect is presumably held "incommunicado" and "cut off from the outside world." <u>Id</u>. (quoting <u>Miranda</u> and applying its central tenet to the in-home interrogation).

---

[8]  Cases finding custody inside a suspect's own home include these, each of which is cited within the argument that follows: <u>Orozco v. Texas</u>, 394 U.S. 324, 326 (1969); <u>United States v. Mittel-Carey</u>, 493 F.3d 36, 40 (1st Cir. 2007); <u>United States v. Colonna</u>, 511 F.3d 431, 436 (4th Cir. 2007); <u>United States v. Cavazos</u>, 668 F.3d 190, 194 (5th Cir. 2012); <u>Sprosty v. Buchler</u>, 79 F.3d 635, 643 (7th Cir. 1996); <u>United States v. Griffin</u>, 922 F.2d 1343, 1354-1355 (8th Cir. 1990); <u>United States v. Revels</u>, 510 F.3d 1269, 1276 (10th Cir. 2007); <u>United States v. Williams</u>, 2013 WL 2318144 *9 (D. Minn. 2013) (unpublished); <u>United States v. Savoy</u>, 889 F. Supp. 2d 78, 109-110 (D.D.C. 2012); <u>United States v. Salceda</u>, 2012 WL 763583 (C.D. Cal. 2012) (unpublished); <u>United States v. Tummins</u>, 2011 WL 3420618 *18 (M.D. Tenn. 2011) (unpublished); <u>United States v. Hallock</u>, 2009 WL 1090697 *7-8 (D. Nev. 2009) (unpublished).

"The home occupies a special place in the pantheon of constitutional rights."
Craighead, 539 F.3d at 1077.  The authors of the Constitution and the justices of the
Supreme Court have time and again trumpeted the sacred nature of that space that is
a man's home.  "The maxim that 'every man's house is his castle' is made a part of
our constitutional law in the clauses prohibiting unreasonable searches and seizures,
and has always been looked upon as of high value to the citizen." Weeks v. United
States, 232 U.S. 383, 390 (1914) (citation omitted) (explaining that this principle
extends far beyond the Fourth Amendment setting).  A man's shield of constitutional
security is at its stoutest inside his own home.  Under the First Amendment, the
government "has no business telling a man, sitting alone in his house, what books he
may read or what films he may watch." Stanley v. Georgia, 394 U.S. 557, 565 (1969).
The Second Amendment prohibits a federal "ban on handgun possession in the
home." District of Columbia v. Heller, 554 U.S. 570, 635 (2008).  The Third
Amendment forbids quartering soldiers "in any house" in peacetime "without the
consent of the [o]wner." U.S. Const. amend. III.  In the end, "[m]ore important than
the familiarity of the surroundings where [a suspect is] being held is the degree to
which the police dominated the scene." Sprosty v. Buchler, 79 F.3d 635, 642 (7th Cir.
1996) (interrogation in suspect's home was custodial).  A man whose home has been
invaded by a dozen law enforcement officers has no other place to go; his final place

of refuge is despoiled and, in the end, is no refuge at all.[9]

> **2.** **The Agents' Hollow Statements – That Mr. Cannon Was Free to Leave, Was Not Under Arrest, and Did Not Have to Talk – Did Not Cure the Custodial Environment.**

The act of advising a suspect that he is free to leave and is not in custody is a "powerful factor in the mix, and generally will lead to the conclusion that the defendant is not in custody." Brown, 441 F.3d at 1347. These words, however, are not talismanic. Indeed, "[E]ven having been told by the officers that he was not in custody and was free to leave does not inexorably lead to the conclusion that [a suspect] was not in custody." Id. at 1349. The notice — if merely lip service — cannot whitewash the other circumstances of control and coercion. "A court must consider the delivery of these statements within the context of the scene as a whole." United States v. Lee, 699 F.2d 466, 467-468 (9th Cir. 1982). This is so because "[t]here may be situations where the restraints placed on a suspect's freedom are so extensive that telling the suspect he was free to leave could not cure the custodial

---

[9] The invasion of a man's home at 6:50 in the morning — with the interrogation 30 minutes later — is all the more likely to be custodial because it occurs at that extraordinarily early hour. See, e.g., Cavazos, 668 F.3d at 192 (raid and interview at 6:30 a.m. is indicative of custody); Hallock, 2009 WL 1090697 *6 (Hallock's first contact with law enforcement was in the darkness of an early October morning); Mittel-Carey, 493 F.3d at 40 (6:25 a.m. interview); Revels, 510 F.3d at 1275 (6:00 a.m. interrogation); Savoy, 889 F. Supp. 2d at 109 (same).

aspect of the interview." Muegge, 225 F.3d at 1271; see also United States v. Hallock, 2009 WL 1090697 *7-8 (D. Nev. 2009) (unpublished) ("[T]his was a confrontation with law enforcement officers which began with a show of force and was followed by isolation from family and close monitoring by armed guards. The coercive nature of the confrontation created a custodial atmosphere that was not easily undone by the agents' statements that [the suspect] would not be arrested that day and was free to go."). This is just such a case.

Before each interrogation session, Agents Westall and Scott told Mr. Cannon that he was free to leave and that he did not have to speak to them. However, in the atmosphere of the Cannon home, flooded as it was with uninvited agents, this promise was meaningless lip service. At 6:50 a.m. before dawn, at least eight armed agents forced their way into the home by battering the door from its frame with a steel ram. As residents were encountered on the main level, they were either handcuffed and isolated, or corralled into a common space, where they remained for hours under armed guard. No one was allowed freedom of movement. Several agents, including one with an M-4 semi-automatic assault rifle, entered the basement and pointed their weapons at Mr. Cannon and his young daughters, ages 10 and 3. Agents ordered Mr. Cannon out of his room and handcuffed his arms behind his back. He was immediately separated from his children, including Maddy who had run to him; the

children were taken upstairs. He remained cuffed in the basement and was eventually escorted by armed agents upstairs to the kitchen table where he was monitored by standing, armed agents until SA Westall, also armed, brought him back to the isolated basement for questioning. There, he was questioned by two, standing, armed agents as he sat on his child's bed in an unfinished, small and dirty room with no windows.

Before being shuttled back to the basement, Mr. Cannon was expressly told that he could not move while agents were there searching. However, during the entire time agents were there (from 6:50 a.m. until 11:00 a.m.), he was never told that the search was completed. Regardless, it was abundantly clear that he was *not* free to move unrestricted, as armed agents escorted him everywhere, including to and from his porch for a smoke. He and everyone else in the home was attended by at least one armed agent the entire time, including his paralyzed and bedridden mother. Mr. Cannon had no opportunity to insist that agents leave his home because they were executing a search warrant for hours. See United States v. Williams, 2013 WL 2318144 *9 (D. Minn. 2013) (unpublished) ("A reasonable person may have a different understanding of his 'freedom to leave' an interrogation in his home during the execution of a search warrant.").

In the end, an agent's instruction to a suspect within his own home that he is "free to leave" is a hollow claim indeed, for where can a suspect reasonably retreat?

As the Ninth Circuit has noted: "If a reasonable person is interrogated inside his own home and is told he is 'free to leave,' where will he go? The library? The police station? He is already in the most constitutionally protected place on earth. To be 'free' to leave is a hollow right if the one place the suspect cannot go is his own home." Craighead, 539 F.3d at 1083. This is precisely the conundrum which Mr. Cannon faced. Purportedly "free to leave" and unobligated to do anything, Mr. Cannon was physically dominated by armed agents and unable to move within his own home. In response to the agent's "notice" that he was free to leave and not obligated to talk, Mr. Cannon, through helpless laughter, recognized his reality, saying "Yeah, but I don't have anywhere to go." (Id. at 2:38-2:44).

### 3. The Number of Armed Agents and Officers Created a Police-Dominated, Custodial Atmosphere.

"When a large number of law enforcement personnel enter a suspect's home, they may fill the home such that there are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation." Craighead, 539 F.3d at 1084. Moreover, "[v]isibly armed law enforcement officers who vastly outnumber a suspect . . . go a long way to making a suspect's home a police-dominated atmosphere." Id. at 1085; see United States v. Panak, 552 F.3d 462, 466 (6th Cir. 2009) (finding custody in home); Sprosty, 79 F.3d at 643 (finding

suspect in custody where agents insisted he have an armed escort at all times within his own home); United States v. Savoy, 889 F. Supp. 2d 78, 109-110 (D.D.C. 2012) (questioning by armed agents whose weapons were visible suggested custody).

There was a constant presence of federal agents milling about the small home in virtually every room for hours. (Tr. 92). The agents dramatically outnumbered the occupants. The federal agents and local officers in this case numbered thirteen, nine from U.S. Department of Homeland Security, one Cobb County TFO, one a Hall County Detective, and two United States Secret Service agents. (Tr. 25-26). Each of the eight DHS agents who *initially* entered brandished firearms; two wielded semi-automatic rifles in addition to a side arm. In addition, there was a local, marked sheriff's cruiser parked in front of the house (undoubtedly along with other police vehicles) with its blue lights activated, suggesting not just the execution of cyber crime search warrant but a locked-down arrest scene. There is no evidence that any of the agents or officers left the scene once it was "secured." The unabated presence of thirteen agents and officers supports a finding of custody. See, e.g., Cavazos, 668 F.3d at 192 (14 law enforcement officers indicates custody); Craighead, 539 F.3d at 1085 (eight agents from three agencies suggests custody); Mittel-Carey, 493 F.3d at 40 (same); Revels, 510 F.3d at 1274 (seven officers weighs toward custody).

4.    **The Agents Physical Domination and Control of Mr. Cannon and His Isolation for Interrogation Created a Custodial Environment.**

A closer look at the physical domination of Mr. Cannon is necessary.  It cannot be overemphasized as a factor because restraint of movement is the *sina qua non* of custody under the applicable legal test.  When agents restrain or restrict a suspect's movement, the reasonable suspect may feel dominated by the police in his own home. See <u>Orozco</u>, 394 U.S. at 325, 327 (finding custody where four officers entered suspect's bedroom and without physically handling the suspect, behaved in a way that made clear the suspect was not free to leave).  It also matters a great deal when the agents "touch[] the suspect." <u>United States v. Schulz</u>, 486 Fed. Appx. 838, 840 (11th Cir. 2012); <u>see</u> <u>also</u> <u>Mittel-Carey</u>, 493 F.3d at 40 ("[T]he level of physical control the agents exercised over [the defendant] in this case weighs heavily in the opposite direction, despite the fact that the control was exercised inside defendant's home.").

The initial physical restraint was, by definition, custodial.  Mr. Cannon was confronted by several agents at gunpoint, ordered to come out of his room, and his arms were handcuffed behind his back.  He remained in the basement handcuffed while his two children, ages 10 and 3, were removed to the main level.  He was escorted to the main level by armed agents, guarded by armed agents in the kitchen, and told that he could not move.  Agent Robeson estimated that he was handcuffed

for 15-20 minutes. (Tr. 45).  The impact of this violent confrontation and custodial seizure cannot be easily undone.  In fact, it was far from undone in this case.

To the contrary, the remainder of the five-hour ordeal fell *far* short of a free-to-leave or, for that matter, a free-to-move environment.  Mr. Cannon was either sitting at the kitchen table or in an unfinished basement room being interrogated.  At all times, he was guarded by standing, armed agents.  His movement between those locations was exclusively at the whim of federal agents and under their control and at their command.  He went where agents told him to go and was confined to where he was taken.

His one brief respite from the house was when he was allowed to smoke a cigarette.  SA Westall and SA Scott brought Mr. Cannon upstairs after the first interrogation session and left him at the kitchen table with another agent. (Tr. 133, 92, 58).  He had asked them to smoke at the end of the first session.  Mr. Cannon, however, met with resistance.  At the start of the second interrogation session – after a one-hour break during which Mr. Cannon was eventually permitted a cigarette – SA Westall made the perfunctory comment that Mr. Cannon was not under arrest and was free to go, that he could "walk out of the house." (Def Ex. 1, followup interview, Time Stamp 00:13-00:22).  Mr. Cannon responded: "I said that to the other agent and he wouldn't let me go. All I wanted was a smoke." (Id. at 00:22-00:30).  SA Westall

27

followed up and asked, "Has anyone forced you to do anything that you don't want to do?" (Id. at 00:45-00:47).  Mr. Cannon replied, "to sit there but that was it," although he agreed that he eventually was permitted a quick smoke. (Id. at 00:47-1:02).  It is evident from this exchange, that Mr. Cannon met with resistence when he tried to "walk out of the house" for his smoke, even though he prevailed and was granted a very short reprieve from the police-dominated home.

For that matter, he simply was *not* permitted to freely walk out of the house to the porch to smoke.  Rather, he was guarded during his hard-fought smoke break and then immediately escorted back to the kitchen table while sentinel-like federal agents loomed over him for the next 45 minutes to 1 hour while SA Westall and SA Scott interviewed Scott Cannon and Maddy. (Tr. 57-58, 133, 95).  He was then escorted back downstairs for a second interrogation. (Tr. 59, 96).  Mr. Cannon was in custody. See United States v. Colonna, 511 F.3d 431, 435-436 (4th Cir. 2007) (custody exists, in part, where agents instruct the suspect and other occupants where to sit, restrict his access to his own home, and direct him to travel to an isolated corner of the home for the interrogation); United States v. Griffin, 922 F.2d 1343, 1354 (8th Cir. 1990) (finding defendant's freedom of action restricted to degree associated with arrest "when he was accompanied by an officer when he retrieved cigarettes from other rooms in the house and was told to remain in view of the agents at all times");

28

Sprosty, 79 F.3d at 641 (constant guard and escort during search warrant execution); Compare United States v. Okakpu, 210 Fed. Appx. 848, 852 (11th Cir. 2006) (unpublished) (defendant permitted to move freely within his home during the interview, albeit under the agents' supervision as a safety precaution).

The agents forbade Mr. Cannon any freedom of choice of movement. Unlike Okakpu – where the agents escorted defendant to rooms of *his* choosing (and never brandished guns or made a show of force) – Mr. Cannon was allowed to leave the kitchen table only to follow Agent Westall to Maddy's bedroom, the site of the interrogation. Meanwhile, the Cannons were corralled like livestock within their own home. In the end, the agents carried out a complete takeover of the home, inside and out, upstairs and downstairs. Mr. Cannon was no more autonomous and had little more freedom of movement than a pawn on a chess board.

Mr. Cannon's isolation in Maddy's bedroom for interrogation supports a finding of custody. Mr. Cannon was escorted to the scene where he was initially confronted at gunpoint, handcuffed, and separated from his small daughters. Surely revisiting the site of the initial traumatic assault by armed agents and confining him to his Maddy's bedroom – whom agents accused him of molesting – objectively created an atmosphere of intimidation and utter separation. The separation of a suspect from his family is "is one of the distinguishing features" of a custodial

29

interrogation, <u>Miranda</u>, 384 U.S. at 445-446, because by exercising this dominion over a suspect, the police isolate him from persons "who might lend moral support during the questioning and deter the suspect from making inculpatory statements." <u>Craighead</u>, 539 F.3d at 1086-87.

Meanwhile, beyond Maddy's room, Mr. Cannon's father, his bedridden and paralyzed mother, and his three small children were confined and watched at all times by armed agents. An interview in the kitchen, living room, the unoccupied upstairs bedroom, or even his *own* bedroom downstairs may have allowed Mr. Cannon to take comfort in familiar surroundings of home. Instead, agents chose to interrogate him in the victim-child's bedroom — on the child's bed, no less — which undoubtedly created what the Ninth Circuit calls the "sensation of being isolated in a police-dominated atmosphere." <u>Craighead</u>, 539 F.3d at 1088-1089; <u>see</u> <u>Cavazos</u>, 668 F.3d at 194 (finding "custody" inside defendant's home where agents told him interrogation was "non-custodial" but where defendant awakened in bed, handcuffed, separated from his family, interrogated by two agents for one hour, and was followed around the house during execution of search warrant). Mr. Cannon was in custody.

**5.    The Agents' Harassing and Threatening Tone,
Their Accusations, and the Threat to Arrest Mr.
Cannon Established Custody.**

An agent's choice of words and the tone of those words during an interrogation

will often define the atmosphere of the interrogation. See Howes, 132 S. Ct. 1189;

United States v. Hinojosa, 606 F.3d 875, 883 (6th Cir. 2010) (listing the manner of

questioning a key factor but finding no hostile or coercive language or behavior);

Tankleff v. Senkowski, 135 F.3d 235, 244 (2d Cir. 1998) (evaluating the language

and tone used by the police).   Veiled and certainly direct accusations of guilt

transform an otherwise peaceful, non-accusatory interview into a custodial cross-

examination, requiring either cooperation or defense. United States v. Jayyousi, 657

F.3d 1085, 1110 (11th Cir. 2011) (once suspect was accused of terrorist activities, any

statements made thereafter were custodial); see Revels, 510 F.3d at 1276 ("After

being confronted with the drugs in an accusatory manner, we have no doubt that

Revels would have reasonably felt compelled to cooperate with the police.").

"Pressure tactics" or "strong arm tactics" by the agents are "more generally associated

with formal arrest" and the use of such tactics is "an indicium of custody." United

States v. Griffin, 922 F.2d 1343, 1351 (8th Cir. 1990); United States v. Tummins,

2011 WL 3420618 *16-17 (M.D. Tenn. 2011) (unpublished) (agents' aggressive,

harsh, and accusatory tone in questioning schoolteacher about his possession of child

pornography contributed to custodial nature of interrogation).

Here, a quick listen to the interrogations makes clear that, from inception, Mr. Cannon was being accused of molesting his daughter and creating and trading in her pornographic images. Mr. Cannon was immediately confronted with the images and repeatedly asked who took them. After denying he took them or any knowledge of who did, the agents continued to badger and harass him by asking him five or six more times about who took the images and countless others times about the offending email address. They challenged him to take a polygraph, implicitly threatened him with exposure based upon forensic results which they would have within "minutes" and, in cynical tones, marveled about his lack of knowledge or the "huge coincidence" that the offending email address shared naming aspects to a common World of Warcraft character.

In the second session, SA Westall dropped any remaining pretense and directly accused Mr. Cannon of the crime. He questioned Mr. Cannon's concern for his daughter and accused him of "half ass" answers and "game playing." In excited and hostile tones, Westall repeatedly threatened to "pin" it on Mr. Cannon and that he would "come with the thunder." (Def Ex. 1, Michael Cannon II followup interview, Time Stamp 6:10-8:51). Westall admitted that what he meant by this was that he would come back to arrest him once forensics established the email link to a device

in the home. (Tr. 143-45).  Forensic agents were on site and the agents intentionally highlighted the point to force a confession. (Tr. 129-31).

In the face of this alarming set of accusations, Mr. Cannon reacted in a way that shows he felt no freedom to terminate the interview.  He answered each and every question of the agents and sat with them until they ran out of questions.  The facade of a neutral witness interview that SA Westall attempted to portray crumbles upon any degree of inspection.  Immediately prior to berating Mr. Cannon and accusing him of lying and of committing the crime, in response to counsel's question about being denied freedom of movement during the break, SA Westall testified:

> Yes, sir, there is that brief discussion where he mentioned something about getting a cigarette and I wanted to reiterate that he was free to leave. Again at this point we didn't know that Mr. Cannon had committed a crime, he had denied committing any crime. And so in all intents and purposes, I mean, he was just another witness that we were interviewing him. And so I wanted to make sure that he knew that he was not under arrest. That is why when you are saying that he wanted to leave and couldn't, I am actually kind of shocked at that because we really didn't know if this guy committed any crimes at this point.

(Tr. 136-37).  However, during the interview, in virtually his next breath, SA Westall accused Mr. Cannon of setting up the email and taking the pictures.  He then threatens to arrest him when forensics are complete.  Mr. Cannon was in custody. Compare United States v. Matcovich, 522 Fed. Appx. 850, 851-51 (11th Cir. 2013) (unpublished) (finding peaceful, non-accusatory interview to be non-custodial in

defendant's home).

###    C.    Mr. Cannon's Statement Was Involuntary Because It Was the Product of a False Promise of Exoneration and Deception.

In <u>United States v. Lall</u>, 607 F.3d 1277 (11th Cir. 2010), Lance Lall was questioned after a home invasion at his parents' house.  The invaders mentioned his name and focused on his bedroom.  Prior to questioning, a detective told him that he was not going to pursue charges against him and that he was interested in developing leads about the home invasion robbery.  <u>Id</u>. at 1281.  Once in the room, Mr. Lall confessed to credit card fraud and the police seized skimmers, encoders, and other evidence.  <u>Id</u>.  Within twenty-four hours, the detective notified the secret service.  <u>Id</u>.  Lall was later called down to the police station and expounded on his earlier statement.  <u>Id</u>.  The Eleventh Circuit found both statements to be involuntary due to the misleading statements made by the detective concerning non-prosecution.  <u>Id</u>. at1285-91.

Deception is a core component of the analysis regarding both the validity of a Miranda waiver and the voluntariness of a statement.  <u>Id</u>. 1283-85.  With respect to the latter, in order for a defendant's statement to be admissible, it "must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight."  <u>Lall</u>, 607 F.3d at 1285

34

(quoting <u>Bram v. United States</u>, 168 U.S. 532, 542 (1897)).  Police misrepresentations may render a statement involuntary if "the government feeds the defendant false information that seriously distorts his choice." <u>Lall</u>, 607 F.3d at 1286 (quoting <u>United States v. Rutledge</u>, 900 F.2d 1127 (7th Cir. 1990) (promise not to prosecute)).  Accordingly, promises not to prosecute, <u>id.</u>, assurances from police that the conversation is "confidential," <u>Hopkins v. Cockrell</u>, 325 F.3d 579, 584-85 (5th Cir. 2003), a promise of immediate release, <u>Streetman v. Lynaugh</u>, 812 F.2d 950, 957 (5th Cir. 1987), or comments that the defendant can speak "off the cuff," all deceive a defendant about the potential use of the statement and make it inadmissible. <u>Lall</u>, 607 F.3d at 1285-87.

The fact that the inducement was unstated or even subtle does not remove the coercive influence.  The Supreme Court has stated:

> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

<u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 228 (1973) (quoting <u>Boyd v. United</u>

<u>States</u>, 116 U.S. 616 (1886) (regarding voluntariness of consent)).   The Supreme

Court condemned such a subtle yet repulsive tactic in <u>Missouri v. Seibert</u>, 542 U.S.

600, 610-12 (2004), where police tactics consisted of a question first, then Mirandize

later approach.   Having already confessed, the suspect is left with no real informed

choice about whether to invoke his rights.   Here, the deception took a different form.

   SA Westall promised Mr. Cannon that he could "clear" himself by taking a

polygraph.   SA Westall made this promise ten minutes into the first interrogation.

(Def Ex. 1, Michael Cannon II interview, Time Stamp 10:10).   The potency of this

promise of exoneration can be heard by Mr. Cannon's repeated resort to taking a

polygraph when confronted with repetitive and accusatory questioning.   During the

initial interrogation, Mr. Cannon suggests taking a polygraph no less than three times

after SA Westall's initial suggestion of a way out. (Id. at 11:46, 14:28, and 25:10).

During the second session, when SA Westall directly accused Mr. Cannon of criminal

activity, tellingly, Mr. Cannon raises the polygraph option and, in fact, there was an

argument over what was said previously about the test. (Def Ex. 1, followup

interview at 7:46-8:50).   Ultimately, SA Westall makes a "deal" with Mr. Cannon

regarding the polygraph; if he takes it and passes, he will refocus his attention

elsewhere. (Id. at 13:20-14:53; Tr. 146).   SA Westall testified that he indeed had the

authority to tell Mr. Cannon that he could be cleared. (Tr. 146).

This was not just subtle coercion, it was overt.  Confronted at gunpoint by several armed agents, handcuffed, handled, and then isolated, interrogated, and accused of a crime, SA Westall then offered Mr. Cannon a way out – a way for it all to stop, to not be accused.  Believing that his continued discussion with agents would ultimately lead to exoneration through cooperation and an eventual polygraph, Mr. Cannon's choices were "seriously distorted." Lall, supra. at 1286.  The clear message sent was that his continued discussion with agents could "clear" him.  SA Westall represented that he had the authority to do it.

It is hardly reasonable to believe that Mr. Cannon would stop talking when offered the possibility of taking a polygraph and clearing himself.   Westall established a plan of cooperation leading to exoneration through polygraph, which was ultimately expressed as a "man to man deal."  Similar to the situation in Lall, this was coercive.   Although the detective procured a statement from Mr. Lall by promising not to pursue charges up front, Mr. Cannon's situation is not materially different.  He was promised no charges, i.e., that he would be "cleared" if he passed a polygraph that morning.   Even if Westall's promise was conditional, it was nevertheless a promise which had the coercive effect of stringing Mr. Cannon along, i.e., coercion.  His statements should be suppressed.

This situation is also comparable to what happened in <u>Williams v. Withrow</u>, 944 F.2d 284 (6th Cir.1991), rev'd in part on other grounds, 507 U.S. 680, 113 S.Ct. 1745 (1993).  In <u>Williams</u>, the Sixth Circuit addressed a situation in which a police officer stated to Mr. Williams, "I'll make you a deal. You tell us everything that happened and you tell us the truth and I confirm it on a polygraph that you're telling us the truth. Yeah, you walk." 944 F.2d at 286.  Mr. Williams was entitled to habeas relief because "an evaluation of 'the entire course of police conduct' in this case establishes that Williams' statements were not voluntary.  His statements were conditioned on his belief that he would be released if he talked." <u>Id</u>. at 289.  For the same reasons, Mr. Cannon's statements were not voluntary and should be suppressed.

### IV.   CONCLUSION

WHEREFORE, for all of the above reasons, Mr. Cannon respectfully requests that his motion to suppress statements be granted.

This 15th day of November 2013.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Thomas L. Hawker
THOMAS L. HAWKER
GEORGIA BAR NO. 338670
Attorney for Michael Cannon II

</div>

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing has been formatted in Times Roman 14 pt., in accordance with Local Rule 5.1B, and was filed this day with the Clerk of Court electronically using the CM/ECF system which will automatically sent email notification of such filing to counsel of record:

>    Mr. Paul Jones, Esq.
>    Assistant United States Attorney
>    600 Richard B. Russell Building
>    75 Spring Street, S. W.
>    Atlanta, Georgia  30303

Dated:  This 15th day of November 2013.

>    <u>/s/THOMAS L. HAWKER</u>
>    Georgia Bar No.  338670
>    Attorney for Michael Cannon II

39