IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL CANNON II | Criminal Action No.<br><br>2:13-CR-09-WCO-JCF |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S POST-HEARING BRIEF IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS**

The United States of America, by Sally Quillian Yates, United States Attorney, and Paul R. Jones, Assistant United States Attorney for the Northern District of Georgia, files this Government's Response to Defendant's Post-Hearing Brief in Support of Motion to Suppress Statements.

**A. Procedural History**

The Defendant, Michael Cannon II, was indicted on April 9, 2103, and charged with one count of producing child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2251(e), one count of distributing child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1), and one count of receiving child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1). (Doc. 1.) The Defendant filed a Motion to Suppress Statements (Doc. 11). This Court conducted an evidentiary hearing on August 30, 2013. (Doc. 28.) The Defendant filed his Post-Hearing Brief in Support of Motion to Suppress Statements on November

15, 2013. (Doc. 32.) He filed a supplement with an exhibit on November 18, 2013. (Docs. 33, 33-1.)

### B. The Evidentiary Hearing

At the hearing, Immigration and Customs Enforcement ("ICE") Special Agent Jeff Robeson testified that he and twelve other agents executed a search warrant at a residence in Gainesville at approximately 6:50 a.m. on February 7, 2013. (Doc. 29-5.) Of the thirteen agents present, eight went to the front door. (*Id.*) Agent Robeson knocked on the door and announced that they were the police and were there to execute a search warrant. (Doc. 29-9-10.) Every agent was wearing a tactical vest marked "Police," and they had their weapons drawn, which was customary when executing a search warrant. (Doc. 29-9.) Someone came to the front door, peeked out of a curtain, said that they could not open the door, and then appeared to walk away. (Doc. 29-10.) Accordingly, agents had to use a ram to open the door and enter the house. (*Id.*) This was done as a safety precaution, as agents had no idea if the person who came to the door had left to get a gun. (Doc. 29-10-11.) The frame of the door was damaged, but the door itself was not broken, and it remained on its hinges. (Doc. 29-12.)

Once inside, agents encountered, Michael Cannon Sr., the Defendant's father. (Doc. 29-13.) He was placed on the floor and handcuffed. (*Id.*) His wife and a small child were also found on the main floor of the residence, but they were not restrained. (Doc. 29-14.) Agents began a protective sweep of the main floor and the basement. (Doc. 29-13-14.) The Defendant and a ten-year-old girl were found hiding in a closet in the basement and then brought upstairs. (Doc. 29-15.) A

three-year-old girl who was in another bedroom was also brought upstairs. (Doc. 29-16.) Once upstairs, the Defendant was also placed in handcuffs for the purpose of maintaining officer safety. (Doc. 29-16-17.) It took approximately three to five minutes to secure the residence. (Doc. 29-34, 66, 108.) As soon as the protective sweep was finished and it was determined that there were no weapons in the house, the Defendant and his father were taken out of their handcuffs. (Doc. 29-16-17.) At that point, all the agents holstered their weapons. (Doc. 29-16-17, 38.) Special Agent Robeson went to his car, put his vest away, and got a copy of the search warrant. (Doc. 29-49.) For the remainder of the agents' stay at the residence, they did not draw their weapons, and nobody was physically restrained. (Doc. 29-18.)

   The Defendant and his father were brought to the kitchen table, where Agent Robeson explained that the agents were there to execute a search warrant. (*Id.*) Neither the Defendant nor his father was in handcuffs at that point. (Doc. 29-64.) Agent Robeson told the Defendant that he was not under arrest and that he was free to leave the residence. (Doc. 29-19.) In fact, the Defendant was not arrested at all that day. (*Id.*) Out of officer safety and while the search was conducted, he was not allowed to move freely about the residence. (*Id.*) At one point, however, he went outside to smoke a cigarette. (*Id.*)

   Special Agents Anthony Scott and David Westall were involved in interviewing the Defendant. (Doc. 29-66-67.) The interview began about fifteen minutes after agents first entered the house and occurred in a bedroom in the basement. (Doc. 29-67.) The agents chose a basement bedroom for the interview

3

for "privacy reasons" — that is, in area that might be more comfortable for discussing the nature of the case. (Doc. 29-98-99.) Agent Westall described that room as being "quiet," and he noted that the room was also suitable because it did not have anything of evidentiary value. (Doc. 29-110.) They chose one of the children's bedroom because the Defendant's bedroom was too cluttered for an interview. (Doc. 29-99.) The bedroom where the interview occurred was estimated to be somewhere between fifteen to twenty feet wide by fifteen to twenty feet long. (Doc. 29-67.) The agents had their weapons holstered during the interview. (Doc. 29-68, 112). Although Agent Westall entered the house carrying an M4, by the time the interview began had put that weapon and his body armor away, and he only had a handgun on his person. (Doc. 29-68, 108.) During the interview, the Defendant was seated on the bed, Agent Scott remained standing to the right of the Defendant, which placed Agent Scott farthest from the door. (Doc. 29-69.) Agent Westall was to the left of the Defendant. (*Id.*) The Defendant , who was not in handcuffs, was seated closest to the door. (Doc. 29-69-70, 110.) After obtaining biographical information from the Defendant, Agents Scott and Westall advised him that he was not under arrest, that he was free to leave at any time, and that he had the option of not talking to the agents. (Doc. 29-70, 111; Govt. Ex. 2.) The Defendant was not threatened at any point, and neither agent made him any promises to induce him to talk. (Doc. 29-73.) At no point did the Defendant state that he did not want to answer any questions. (Doc. 29-72.)

According to the recorded interview, Agent Westall told the Defendant, "You are not under arrest. Nobody in this house is under arrest. . . . You're free to leave. You can get up and walk right out right now if you want." (Govt. Ex. 2, 2:18-2:37.) Agent Scott told the Defendant, "We just want to let you know you can talk, or not talk, whatever, okay?" (Govt. Ex. 2, 3:01-3:06.) Based on comments that the Defendant made near the beginning of the interview, he had already spoken to his mother. (Govt. Ex. 2, 2:28-2:30.) Following this advice, Agent Scott explained to the Defendant that their job duties included protecting children and that "someone in the house—we don't know who—may have information that can help us." (Gov. Ex. 2, 3:25-3:58.) After the Defendant denied taking the photographs that are the subject of Count One of the indictment, Agent Westall asked him if he would take a polygraph examination. (Govt. Ex. 2, 10:10-10:12.) The Defendant asked what his rights were regarding taking a polygraph, and he was told that he would not have to take one. (Govt. Ex. 2, 10:16-10:20.)

After a break of forty-five minutes to an hour, the agents re-interviewed the Defendant. (Doc. 29-112.) At the outset, the agents again advised the Defendant that he was not under arrest, that he was free to leave, and that he was not obligated to talk to them. (Def. Ex. 1.) The Defendant was in fact not arrested that day. While the agents were at the house, the Defendant checked on his mother, went outside for a cigarette, and got something to drink. (Doc. 29-113-114, 135.) Out of officer safety, he was not allowed to wander around the house but was asked to stay in a centralized location. (Doc. 29-114.)

5

## C. Argument and Citation of Authority

The Government contends that the Defendant was not in custody when he made statements. Therefore, his statements are admissible at trial.

A person is entitled to advice of rights when he is in custody. *Miranda v. Arizona*, 384 U.S. 436 (1966). By contrast, someone who is not in custody is not entitled to *Miranda* warnings. *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006). The first step to determine whether a person is in custody for *Miranda* purposes "is to ascertain whether, in light of the objective circumstances of the interrogation" and the totality of all the circumstances, "a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012) (citations omitted). "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is the reasonable innocent person. Whether a defendant knows he is guilty and believes that incriminating evidence will soon be discovered is irrelevant." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996) (citations omitted). "[T]he ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Yarborough v. Alvarado*, 541 U.S 652, 662 (2004). An interviewee's "status as a suspect, and the 'coercive environment' that exists in virtually every interview by a police officer of a crime suspect," does not automatically create a custodial situation. *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000) (quoting *Phillips*, 812 F.2d at 1360-61). "[T]he ultimate inquiry, based on the circumstances of each case, is whether there is a restraint on the suspect's

freedom of movement 'of the degree associated with a formal arrest.'" *United States v. Phillips*, 812 F.2d 1355, 1359 (11th Cir. 1987) (quoting *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984)). If the interviewee is not in custody, he is not entitled to *Miranda* warnings, and any statements that he makes are admissible against him. *United States v. Luna-Encinas*, 603 F.3d 876, 882 (11th Cir. 2010).

The totality of circumstances here show that the Defendant was not in custody and was therefore not entitled to advice of *Miranda* rights. Accordingly, there was no Fifth Amendment violation.

As noted above, the Defendant was interviewed in a bedroom in the home where he was living. This fact weighs in favor of finding that the interview was not custodial. "Courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." *United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006) (internal quotations, emphasis and citations omitted); *see also Luna-Encinas*, 603 F.3d at 882 (even though the defendant was told by armed officers to sit down in his front yard while his house was being secured, he was not in custody in part because "he was on familiar ground in his own front yard").[1]

---

[1] The Defendant cites the case of *Orozco v. Texas*, 394 U.S. 324 (1969), for the proposition that a person can be in custody in his own home when he is interviewed. Def. Br. at 19. In that case, however, the defendant was already placed under arrest and was not free to leave when he was interviewed. *Id.* at 327. That case is inapplicable here, as the record shows that the Defendant was not arrested the day of the interview.

7

In addition, the Defendant was advised prior to each of the two interviews that he was not under arrest, that he was free to leave, and that he could choose not to answer the agents' questions. This is another fact that weighs in favor of finding that he was not in custody. *See, e.g.*, *Brown*, 441 F.3d at 1347 ("Unambiguously advising a defendant that he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the defendant is *not* in custody absent a finding that 'restraints are so extensive that telling the defendant he was free to leave could not cure the custodial aspect of the situation.'") (quoting *United States v. Muegge*, 225 F.3d 1267, 1271 (11th Cir. 1996)) (emphasis in original). *See also United States v. Phillips*, 812 F.2d 1355, 1362 (11th Cir. 1987) ("Officer Carmichael testified that [the defendant] was free to leave the police station at any time during the interview."). The agents provided the Defendant with all the assurances that his discussion with them was voluntary, and the Defendant chose not to exercise his right to leave or to not talk to them. *Brown*, 441 F.3d at 1349 ("Brown never exercised the most basic method at his disposal for avoiding discussions with police—simply not talking to them. Despite what he was told, he voluntarily remained in the house *and* chose to speak with the police.") (emphasis in original).[2]

---

[2] The Defendant alleges in his brief that the agents threatened to arrest him during the second interview. Def. Br. at 31. Despite this bold accusation, the Defendant is unable to locate a single point in the interview where the agents told him that they would place him under arrest.

8

Moreover, the Defendant was not restrained in any way during either of the two interviews. This lack of restraint is yet one more factor that supports the finding that the interviews were non-custodial and that *Miranda* rights were not required. *See Muegge*, 225 F.3d at 1271 (the defendant must establish that the restraints were extensive); *Brown*, 441 F.3d at 1349 (the defendant was not restrained, even though the police had confiscated his shoes); *United States v. Grimes*, 142 F.3d 1342, 1349 (11th Cir. 1998) (the defendant was not restrained in any way); *United States v. Thomas*, 193 F. App'x 881, 886 (11th Cir. 2006) (even though the defendant was briefly handcuffed and then transported to the police station, she was not restrained during the interview and so was not in custody).

Similar to the issue of restraint, the agents did not threaten the Defendant in any way or display any coercive tactics which would have converted the interview into a custodial situation. Although they had their firearms with them, they kept them holstered during the interviews. The lack of threats by the agents shows that the Defendant was not in custody. *United States v. Barry*, 479 F. App'x 297, 299 (11th Cir. 2012) (even though the defendant was interviewed several times during the execution of several search warrants, he was never threatened or detained, and the officers did not brandish weapons); *Phillips*, 812 F.2d at 1362 ("[T]here is no suggestion that [the officers] resorted to physical or psychological pressure of any sort in order to obtain the statements from appellees."); *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996) ("However, while [courts] have enumerated a number of (non-exclusive) factors that may bear on the issue

of voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . .") (internal citations omitted).

Finally, the Defendant was not only told that he would not under arrest that day, but in fact he was not arrested until weeks after the he was interviewed. Courts have found that not being placed under arrest shows that the interviewee was not in custody. *See, e.g., Muegge*, 225 F.3d at 1271. The totality of circumstances shows that the interview "did not involve the type of 'highly intrusive' coercive atmosphere that may require *Miranda* warnings even before a formal arrest is made." *United States v. Crawford*, 294 F. App'x 466, 474 (11th Cir. 2008) (quoting *United States v. Acosta*, 363 F.3d 1141, 1150 (11th Cir. 2004)).

With much verve and exuberance, the Defendant attempts to portray the events at his residence on February 7, 2013, as a stormtrooper-dominated atmosphere where he was in custody from the moment the agents entered the house to the moment they left. The Defendant also relies primarily on one Ninth Circuit Case, *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008). Unfortunately for the Defendant, the Eleventh Circuit, compared to the Ninth Circuit, has outlined a markedly different definition of what constitutes a custodial situation. Equally unfortunate for the Defendant, this Court is bound to follow Eleventh Circuit case law, not the law of other circuits. *OSI, Inc. v. United States*, 285 F.3d 947, 952 n.3 (11th Circ. 2002) ("[W]e are not bound by decisions of our sister circuits . . . ."). With the guidance of controlling case law, it is clear that the circumstances at the residence do not depict a situation where the Defendant was in custody before, during, or after the interviews.

At a starting point, it is imperative to note that merely being questioned by a federal agent does not create a coercive environment that puts the interviewee in custody and thus triggers *Miranda* rights. The Supreme Court has commented that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Oregon v. Mathiason*, 429 U.S. 492, (1977). The Court noted, however, that "police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Id.* It emphasized that the touchstone is whether "there has been such a restriction on a person's freedom as to render him 'in custody.'" *Id.* Although the presence of agents in the Defendant's home may be somewhat coercive, their mere presence does not equate to custody.

The Eleventh Circuit has considered whether the presence of agents in a home effectively places the suspect in custody. In *United States v. Matcovich*, 522 F. App'x 850, 851 (11th Cir. 2013), the defendant was charged with child pornography offenses. He appealed the denial of his motion to suppress his statements, alleging that they were the product of custodial interrogation. *Id.* The Eleventh Circuit noted that there were some factors that suggested that the interview was custodial. Specifically, "when law enforcement officers entered the boarding house where [the defendant] lived in order to execute the search

11

warrant, there was a 'police-dominated atmosphere' with a number of officers handcuffing residents and bringing them to a central location." *Id.* at 852. The court went on to note that the residents were told that they were not under arrest and that they were restrained for officer safety. *Id.* Shortly afterwards, the handcuffs were removed. *Id.* The Eleventh Circuit also commented on other factors suggestive of custody: the defendant was not allowed to go to his bedroom unescorted while the search warrant was being executed, and he was required to leave the door slightly open when using the bathroom. *Id.* Despite these factors that could be suggestive of custody, the Eleventh Circuit found that the interrogation was not custodial for the following reasons: (1) the defendant was told that he was free to leave, was not in custody, and was not under arrest; (2) he was interviewed in the "familiar and comfortable surroundings" of his home; (3) he was not physically restrained during questioning; (4) the agents' weapons were holstered during the interview; (5) although he had to be accompanied by an agent for officer safety, the defendant was free to move about his house; (6) the agent did not convey his suspicion that the defendant was a perpetrator; and (7) at the conclusion of the interview, the defendant left voluntarily with an FBI polygrapher and was not arrested that day. *Id.* These factors are almost exactly on point with the facts of this case: the Defendant was told at least twice that he was not under arrest and was free to leave, he was interviewed in "the familiar and comfortable surroundings" of his own home, he was not restrained, the agents' weapons were holstered during the interview, he was free to move about (albeit escorted for officer safety) when not being

interviewed, and he was not arrested that day. Despite the presence of agents in the house, the totality of the circumstances show that the defendant was not in custody.

Similar cases from the Eleventh Circuit show that restrictions on freedom of movement do not equate to custody or formal arrest. In *Brown*, 441 F.3d at 1348-49, the court noted that "an officer accompanied [the defendant] throughout the house for safety reasons" while a search warrant was being executed. Being escorted did not amount to custody. The court reached the same conclusion in *United States v. Opoku*, 210 F. App'x 848, 852 (11th Cir. 2006), where the defendant was free to move about his apartment, "albeit under the agents' supervision as a safety precaution." Even when handcuffed and held at gunpoint, a suspect is not necessarily under arrest. *United States v. Blackman*, 66 F3d 1572, 1576-77 (11th Cir. 1995).

Significantly, the Supreme Court has determined that a person who is serving a prison sentence is not in custody for purposes of *Miranda*. *Howes v. Fields*, 132 S. Ct. 1181 (2012). In that case, the defendant was in jail in Michigan. *Id.* at 1185. While there, he was escorted by a corrections officer down one floor and then through a locked door that separated two sections of the correctional facility. *Id.* at 1185-86. He was finally taken to a conference room where two sheriff's deputies questioned him for five to seven hours about allegations that he had sexual abused a 12-year-old boy. *Id.* at 1186. The defendant was never advised of his *Miranda* rights or even told that he could refuse to talk to the deputies; instead, he was told that he was free to leave and return to his cell whenever he

13

wanted. *Id.* The sheriff's deputies were armed during the interview, but the defendant was not handcuffed or restrained in any way. *Id.* The door to the conference room remained sometimes open and sometimes shut. *Id.* After being convicted in state court, the defendant files a habeas petition in federal court. *Id.* The district court found that the defendant had been in custody and that the deputies should have advised him of his *Miranda* rights. *Id.* The Sixth Circuit affirmed this finding, stating that the defendant's "isolation from the general prison population combined with questioning about conduct that occurred outside the prison makes any such interrogation custodial *per se*." *Id.* at 1186-87. The Supreme Court did not agree. The Court stated that it had "repeatedly declined to adopt any categorical rule with respect to whether the questioning of a prison inmate is custodial." *Id.* at 1187. The Court stressed that the focus was on "the danger of coercion [that] results from the *interaction* of custody and official interrogation." *Id.* at 1188 (quoting *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) (internal quotations and citations omitted; emphasis in original). The Court emphasized that "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Fields*, 132 S. Ct. at 1189. It stressed looking at "the objective circumstances of the interrogation," with an emphasis on whether a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* (citations omitted). The Court noted that whether the individual's freedom of movement was curtailed is merely the first step in the analysis, because "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Id.* The

14

Court identified some of the factors that a lower court should examine, including: location of the questioning, duration of the questioning, statements made during the interview, the presence or absence of physical restraints during the interview, and the release of the interviewee at the end of the questioning. *Id.* The Court concluded that "imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*." *Id.* at 1190.

If a person who is in state custody is not in custody for purposes of *Miranda*, the same holds true for the Defendant in this case, especially when considering those factors that the Supreme Court identified. As noted previously, the Defendant was interviewed in his own home. Unlike *Fields*, where the interview lasted five to seven hours, the combined interviews of the Defendant lasted about an hour. The Defendant was not restrained during the interview. He admitted to partial association with the elements of the e-mail address associated with the investigation, but he did not admit to producing child pornography. The Defendant was free to move about the house—albeit escorted—between and after the interviews. And he was not placed under arrest that day. These factors show that the Defendant was not in custody on the day of the interview.

The Defendant argues that the agent's mention of his taking a polygraph to clear himself amounted to a promise of non-prosecution. As is his habit, he cites a number of cases that are not binding on this Court. But he also cites the Eleventh Circuit case of *United States v. Lall*, 607 F.3d 1277 (11th Cir. 2010). The Defendant's reliance on this case is completely misplaced. In *Lall*, the police responded to a call of a home invasion and arrived to investigate. *Id.* at 1281.

After the police arrived, the defendant returned home, and a detective advised him of his *Miranda* rights was but told that any information that he shared would not be used to prosecute him. *Id.* The defendant showed the detective the equipment he used to commit identity theft, including skimming devices. *Id.* He was not arrested, and several days later the detective asked him to come down to the police station with his father. *Id.* The detective told the defendant's father that they did not need a lawyer, and he reassured him that the defendant would not be charged with any information that he provided. *Id.* The defendant again waived his *Miranda* rights and provided more information about the identity theft that he had been committing. *Id.* at 1281-82. Unbeknownst to the defendant, the state detective was sharing his information with the Secret Service, who began working up the case. *Id.* at 1282. The defendant was eventually charged and convicted of federal crimes. *Id.* at 1280. The Eleventh Circuit found that the two promises of non-prosecution rendered the defendant's *Miranda* waivers involuntary. *Id.* at 1283-84. It specifically noted that the detective's two express promises of non-prosecution was deceptive and undermined the prophylactic effect of the *Miranda* warnings. *Id.* at 1287.

   Here is where the Defendant's reliance on *Lall* falls flat: neither Agent Scott nor Agent Westall ever promised the Defendant that he would not be prosecuted if he took a polygraph test. Moreover, there is nothing deceptive about asking the Defendant to take a polygraph test. As Agent Westall explained, passing a polygraph test would show the investigators that the person was likely being truthful and that the investigators needed to refocus their efforts on other

16

persons. (Doc. 29-148.) It is unrealistic to claim that a request to take a polygraph is a deceptive practice. Moreover, the Defendant cannot show how he was prejudiced. He was expressly advised that he could refuse to take a polygraph test, and he in fact exercised the option not to take such a test. (Doc. 29-128.) The discussion of taking a polygraph did not equate to a promise of non-prosecution, and the agents did not engage in deceptive practices by raising the subject.

## Conclusion

The totality of the circumstances show that the Defendant was not in custody when the agents interviewed him. Although he was handcuffed when the agents made a sweep through the house, his handcuffs were removed as soon as the agents determined that the house was safe. Before each interview, the Defendant was told that he was not under arrest, that he was free to leave, and that he could choose not to answer any questions. The Defendant was interviewed in his own home, he was not restrained during the interview, and he was not placed under arrest that day. The Government requests that this Court deny the Defendant's Motion to Suppress Statements.

                                              Respectfully submitted,

                                              SALLY QUILLIAN YATES
                                                *United States Attorney*

                                          /s/PAUL R. JONES
                                                *Assistant United States Attorney*
                                              Georgia Bar No. 402617
                                              Paul.Jones@usdoj.gov

**Certificate of Service**

I served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

>Thomas L. Hawker, Esq.
>Federal Defender Program, Inc.

January 8, 2014

>/s/ PAUL R. JONES
>
>PAUL R. JONES
>
>*Assistant United States Attorney*