IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA      :
     :     CRIMINAL INDICTMENT
v.      :     NO.: 2:13-CR-009-WCO-JCF
     :
MICHAEL CANNON II      :

## REPORT AND RECOMMENDATION

This case is before the Court on Defendant's motion to suppress statements he made to law enforcement agents on February 7, 2013. (Doc. 11). Because Defendant was not in custody when he made the statements at issue, agents were not required to advise him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) before questioning him. Furthermore, the undersigned finds that Defendant made the statements voluntarily. Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress be **DENIED**.

## Background

An Indictment filed April 9, 2013 (Doc. 1) charges Defendant with producing child pornography in violation of 18 U.S.C. §§ 2251(a) and 2251(e) (Count One), distributing child pornography in violation of 18 U.S.C. § 2252(a)(2) and 2252(b)(1) (Count Two), and receiving child pornography in violation of 18 U.S.C. §§ 2252(a)(2 and 2252(b)(1) (Count Three). On May 13, 2013, Defendant

filed the pending motion to suppress. (Doc. 11). The Court conducted a hearing on Defendant's motion on August 30, 2013 (*see* Doc. 28), and a transcript of the hearing was filed on October 1, 2013 (Doc. 29).[1] Defendant submitted a post-hearing brief on November 15, 2013 (Doc. 32; *see also* Doc. 33); the Government responded on January 8, 2014 (Doc. 39); and Defendant replied on February 12, 2014 (Doc. 44). Briefing is complete, and the undersigned now considers the merits of Defendant's motion.

## Facts

At the hearing, the Government presented the testimony of Jeff Robeson, Anthony Scott, and David Westall, Special Agents with the United States Department of Homeland Security.

Agent Robeson, whose duties included investigating child exploitation cases, is the case agent for the investigation of Defendant. (Tr. 4). Agent Robeson obtained a search warrant for a single-family residence at 2675 Lee Land Road in Gainesville, Georgia in connection with an investigation of internet images of a young girl. (Tr. 4-5, 23). Agent Robeson and 12 other agents and officers (collectively referred to as "agents") executed the warrant on February 7, 2013. (Tr. 4-5). Eight agents, lead by Agent Robeson, approached the front door at approximately 6:50 a.m. (Tr. 5, 8). The living room light and a television were

---

[1] References to the transcript of the August 30, 2013 hearing are designated as "Tr. ___."

on.  (Tr. 22).   Agent Robeson knocked on the door, identified the agents as the police, directed the occupants to open the door, and stated they had a search warrant. (Tr. 5-9).

A man came to the door and asked, "Who is it?"  (Tr. 10).   Robeson repeated that they were the police, they had a search warrant, and directed the man to open the door.  (*Id.*).  The person "peek[ed] out a little part of the front door," stated that he could not open the door, and walked away.  (Tr. 10, 30, 76-77).  The agents then used a ram to break open the door and enter the residence.  (Tr. 10).   Agent Robeson explained that they used the ram to enter the residence due to officer safety; they did not know who else was in the residence, or whether the "individual walking away from the door was going to get a gun."  (Tr. 10-11).

The agents were wearing their tactical vests with "Police" on them, and had their sidearm handguns or M4 long arms drawn as they entered and swept the residence, which is customary practice for officer safety when they execute a search warrant.  (Tr. 9, 16-17, 39, 43, 68, 79).  Upon entering the residence, the agents encountered Defendant's father, Michael Cannon, Sr., in the kitchen area.  (Tr. 13).  They put him face down on the floor and handcuffed him.  (Tr. 13, 33-34).  The agents then "swept" or "cleared" the main level of the residence and the basement, i.e., they searched for other people and weapons.  (Tr. 13, 106-08).  A young boy was in the living room on a couch watching television, and Defendant's

mother, who had had a stroke and is bedridden, was in bed in a bedroom on the main level.  (Tr. 14, 32-33, 107).  Agent Robeson remained with the boy, and Agent Westall remained with Ms. Cannon while the other agents continued the protective sweep of the residence.  (Tr. 34-36, 106-07).  Neither the boy nor Defendant's mother were placed in handcuffs.  (Tr. 14).

Approximately three agents, including Agent Scott, went to the basement with weapons drawn, and some of the agents found Defendant and Defendant's ten-year-old daughter in a bedroom closet in the basement.  (Tr. 15-16, 29, 39-40, 66-67).  The agents commanded Defendant to walk out of the closet and show his hands, and he complied.  (Tr. 15).  Defendant was handcuffed outside of the bedroom.  (Tr. 15, 45, 81).  Defendant's three-year-old daughter was found in the girls' bedroom in the basement. (Tr. 16).  The girls were not handcuffed.  (Tr. 16). All of the children were taken to their grandmother's (Defendant's mother's) bedroom where they stayed with their grandmother.  (Tr. 16, 35, 47-48).

Defendant and his father remained in handcuffs during the initial sweep of the residence for officer safety, because the agents did not know how many people were in the residence.  (Tr. 16-17, 45).  After the agents determined that there were no weapons or anything else of concern for officer safety, the agents put away their

weapons[2] and released Defendant and his father from handcuffs.   (Tr. 17-18).

After the initial sweep, the agents kept their weapons holstered, and the occupants

remained unrestrained.  (Tr. 17-18, 68-69, 109).

Agent Robeson explained to Defendant and his father, who were no longer

handcuffed, why they were there, i.e., a "child exploitation investigation involving

a ten-year-old girl," and provided them a copy of the search warrant.  (Tr. 18, 46,

49, 51).  The agents told Defendant he was not under arrest and he was free to

leave, but that while the agents were searching the residence, for officer safety, he

was not allowed to move freely about the house.  (Tr. 19, 52).  Agents remained

with the occupants of the house while it was searched.  This was done to ensure

officer safety, because the agents did not know if there were weapons in the house,

and they did not want to be interrupted or impeded during the search.  (Tr. 62-63,

113-14).

Agent Westall asked Defendant if he would consent to an interview, and he

said "yes."  (Tr. 119-20).  Westall and Scott escorted Defendant downstairs to

interview him in his daughters' bedroom.[3]  (Tr.  19, 53-54, 67, 110, 119).  The

windowless room is approximately 15 to 20 feet by 15 to 20 feet; it had a bed and a

---

[2] The agents holstered the handguns and secured the M4 rifles in their vehicles.
(Tr. 38, 68, 108-09).
[3] While Westall and Scott interviewed Defendant, the other agents searched the
residence, took photos, and performed forensic analyses of computers found in the
residence.  (Tr. 18-20, 58).

crib in it.  (Tr. 67-68, 79-80, 85, 110).  Defendant sat on the bed, Agent Scott stood

to his right, and Agent Westall stood to Defendant's left. (Tr. 69, 87-88, 110-11).

Defendant was not in handcuffs or restrained in any way.  (Tr. 69-70, 111).

Agent Scott explained that they interviewed Defendant in the girls' bedroom

in the basement for privacy reasons, because the upstairs "was laid out in a way

that it wouldn't allow [them] to conduct an interview in an environment that would

be conducive to someone being comfortable talking to [them]."  (Tr. 97-98).  They

did not use Defendant's basement bedroom for the interview due to the clutter.

(Tr. 98).  Agent Westall explained that they used the daughters' bedroom because

it was quiet, and "it seemed to have less evidentiary value in it at the time, meaning

it didn't seem to have any computers and things of that nature, which according to

the search warrant [they] were there to seize."  (Tr. 110).

Agent Scott first asked Defendant for "biographical data," including name,

address, phone number, etc.  (Tr. 70).  The agents informed Defendant that he was

not under arrest, that he was free to leave at any time, that he did not have to stay if

he did not want to stay, and that he could give a statement, but he did not have to

make one. (Tr. 70, 111-12, 122).  The agents did not advise him of his *Miranda*

rights, i.e., the right to remain silent, to have a lawyer present, etc.  (Tr. 122).

Defendant appeared to understand the agents, and did not appear to be under the

influence of drugs or alcohol.  (Tr. 70-71).  The agents asked Defendant about

6

photographs of his ten-year-old daughter that had been found on the internet, and questioned him about his email addresses, internet use, and electronic devices, including computers and cell phones. (*See* Tr. 123-32; Gov't Ex. 2). Defendant denied taking the photographs at issue, denied using the email address under investigation, and he agreed to take a polygraph. (*See id.*). Defendant stayed with the agents and spoke with them; he never told the agents that he did not want to talk with them, or wanted to leave, and he never asked for a lawyer. (Tr. 71-72, 123). That interview, which was recorded, lasted approximately 25 minutes. (*See* Gov't Ex. 2).

At the end of the interview, Defendant asked to go out to smoke a cigarette, and the agents told him he could do so. (Tr. 73-73, 92, 132; Gov't Ex. 2). The agents escorted Defendant upstairs, and he was allowed to go outside to smoke, accompanied by an agent, while the agents interviewed Defendant's father and older daughter in the girls' bedroom. (Tr. 56-57, 72, 92-93, 95, 101, 133).

After speaking with Defendant's father and daughter, Agents Westall and Scott decided to re-interview Defendant. (Tr. 72, 112). Agent Scott testified that he believed that Defendant was not being truthful about his knowledge of specific email addresses involved in the child pornography investigation. (Tr. 91-92). Roughly 30 minutes to an hour after the first interview the agents returned with Defendant to the girls' bedroom to follow up. (Tr. 56-57, 59, 72, 94, 96, 112).

7

At the beginning of the second interview, the agents again told Defendant he was free to leave.  (Tr. 133-34, 136-37; Def. Ex. 1).  Agent Westall again questioned Defendant about his email addresses, accused him of using the email address under investigation, of taking the pictures at issue, and of being untruthful, all of which Defendant denied.  (*See* Def. Ex. 1).  Approximately half-way through the second interview, Westall stated, "we pin it back to you, I'm coming with the thunder," or similar words.[4]  (*See* Tr. 143; Def. Ex. 1).  Defendant told Agent Westall to "bring the thunder," continued to deny the accusations, and repeated that he was willing to take a polygraph.  (*See* Def. Ex. 1).  The second interview lasted approximately 16 minutes.  (*See* Def. Ex. 1).  After the second interview was over, agents brought Defendant back upstairs.  (Tr. 60, 99-100).

Once the agents finished the search, they remained on the scene until Georgia Department of Family and Children Services ("DFACS") officials arrived, and then left the residence at approximately 11 a.m.  (Tr. 20, 52, 61).  The agents did not arrest anyone at the house that day.  (Tr. 19-20).

## Discussion

Defendant seeks to suppress his statements to law enforcement on two grounds: (1) Agents Westall and Scott interrogated him while he was in custody without having first advised him of his rights under *Miranda*; and (2) his

---

[4] The agent implied that once the forensic review of the seized materials was completed that they could "pin it back" on Defendant.  (*See* Tr. 143; Def. Ex. 1).

statements were not voluntarily made, but instead were "the product of an otherwise coercive environment." (Doc. 32 at 1-2).

## I.   <u>Was Defendant Subjected To Custodial Interrogation?</u>

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. In *Miranda*, the Supreme Court held that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. Specifically, before a person in custody is interrogated, he must be advised that he has the right to remain silent; that anything he says can and will be used against him in court; that he has the right to consult with a lawyer and to have the lawyer with him during interrogation; and that if he cannot afford a lawyer, a lawyer will be appointed to represent him. *Id*. at 467-73. "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*.

It is well-settled, however, that "[p]re-custodial questioning does not require *Miranda* warnings." *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (original formatting altered) (citing *United States v. Brown*, 441 F.3d 1330, 1347-49 (11th Cir. 2006)). "A defendant is in custody for the purposes of *Miranda* when

there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' " *Street*, 472 F.3d at 1309 (original formatting altered) (quoting *Brown*, 441 F.3d at 1347).  In *Street*, the Eleventh Circuit explained that the definition of "custody" for *Miranda* purposes is not the same as the definition of "seizure" for Fourth Amendment purposes:

> [A] seizure does not necessarily constitute custody for *Miranda* purposes.  The standards are different.  The Fourth Amendment seizure analysis uses the "free to leave" test: a person is "seized" when a reasonable person would not feel free to terminate the encounter with the police.  By contrast, a person is in "custody" for *Miranda* purposes only when there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Street*, 472 F.3d at 1309-10 (internal citations omitted) (quotation marks omitted); *see also United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010) ("We previously have explained, however, that although a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment -- and thus may be deemed to have been 'seized' by law enforcement -- he will not necessarily be considered in 'custody' for Fifth Amendment purposes." (citing *Street*, 472 F.3d at 1310)).

The court in *Street* explained further that the test for whether a person is "in custody" is a "totality of the circumstances determination," and it is objective, as viewed from the perspective of "a reasonable innocent person."  472 F.3d at 1309.  Thus, "the actual, subjective beliefs of the defendant and the interviewing officer

on whether the defendant was free to leave are irrelevant." *Id.* (quoting *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)).

When applying this test, the court should consider several factors, "including whether 'the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.' " *Id.* (quoting *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1989)); *see also United States v. Dix*, No. 3:12-cr-00007-TCB-RGV, 2013 U.S. Dist. LEXIS 22476, at *12 (N.D. Ga. Jan. 29, 2013) ("[F]actors relevant to this determination include, but are not limited to, the location of the interview, the existence of any physical restraints such as handcuffs or drawn weapons, whether the suspect asked to leave, the officers' demeanor, the degree of pressure applied to the suspect, and whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled."), *adopted by* 2013 U.S. Dist. LEXIS 21902 (N.D. Ga. Feb. 19, 2013); *United States v. Johnson*, No. 2:12-cr-92-FtM-29DNF, 2013 U.S. Dist. LEXIS 108849, at *58 (M.D. Fla. Feb. 8, 2013) ("Some factors to consider include the location of the questioning, its duration, the types of statements made during the questioning, the presence of physical restraints, and the release of the suspect at the end of the questioning."), *adopted by* 2013 U.S. Dist. LEXIS 108850 (M.D. Fla. Aug. 2,

2013).  "No one fact is determinative of the issue of whether the interview was custodial or not." *Id.* at *59.

"Unless restraint of an individual by law enforcement personnel is 'significant,' *Miranda* warnings are not required."  *United States v. Montos*, 421 F.2d 215, 222-23 (5th Cir. 1970).  Furthermore, it is the defendant's burden to establish that he was in custody for purposes of *Miranda*.  *See United States v. Asher*, No. 1:09-CR-414-JOB/AJB, 2010 U.S. Dist. LEXIS 112783, at *22-23 (N.D. Ga. Feb. 25, 2010) ("[A] defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning."), *adopted by* 2010 U.S. Dist. LEXIS 112823 (N.D. Ga. Oct. 21, 2010).[5]

Here, it is undisputed that Defendant's statements were made in response to Agents Westall and Scott questioning him, and they did not advise him of his *Miranda* rights prior to questioning him.  The issue here turns on whether Defendant was in custody.  If he was, the requirement that he be advised of his *Miranda* rights before questioning would have been triggered.  Defendant argues that he was in custody because Agents Westall and Scott "interrogated [him] in a setting so dominated by law enforcement officers that [he] found himself in

---

[5] If a defendant establishes that his statements were the product of custodial interrogation, it is the government's burden to prove that the defendant voluntarily waived his privilege against self-incrimination. *See Asher*, 2010 U.S. Dist. LEXIS 112783, at *23.

custody within his own home." (Doc. 21 at 16).  Defendant recounts the following

in support of that assertion:

> At 6:50 a.m. before dawn, at least eight armed agents forced their way
> into the home by battering the door from its frame with a steel ram.
> As residents were encountered on the main level, they were either
> handcuffed and isolated, or corralled into a common space, where
> they remained for hours under armed guard.  No one was allowed
> freedom of movement.  Several agents, including one with an M-4
> semi-automatic assault rifle, entered the basement and pointed their
> weapons at Mr. Cannon and his young daughters, ages 10 and 3.
> Agents ordered Mr. Cannon out of his room and handcuffed his arms
> behind his back.  He was immediately separated from his children,
> including Maddy who had run to him; the children were taken
> upstairs.  He remained cuffed in the basement and was eventually
> escorted by armed agents upstairs to the kitchen table where he was
> monitored by standing, armed agents until SA Westall, also armed,
> brought him back to the isolated basement for questioning.  There, he
> was questioned by two, standing, armed agents as he sat on his child's
> bed in an unfinished, small and dirty room with no windows.

(Doc. 32 at 22-23).  Defendant also contends that "the agents' harassing and

threatening tone, their accusations, and the threat to arrest [him] established

custody."  (*Id*. at 31).  The undersigned disagrees, and finds that under the totality

of the circumstances, Defendant was not in custody when Agents Westall and Scott

interviewed him during the execution of the search warrant on February 7, 2013.

In the first place, Defendant was not in custody by virtue of the agents' entry

into Defendant's residence with guns drawn in order to execute the search warrant,

and their handcuffing of Defendant during the initial protective sweep of the

residence.  " '[A] warrant to search for contraband found on probable cause

implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.' " *Asher*, 2010 U.S. Dist. LEXIS 112783, at *15 (quoting *Michigan v. Summers*, 452 U.S. 692 705 (1981)). "Detaining a suspect while executing a lawful search warrant does not automatically render the suspect in custody for purposes of *Miranda* warnings." *Id.* at *16 (citing *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006)). "To hold that detention of a suspect while executing a lawful warrant at his residence is the legal equivalent of custody for *Miranda* purposes would run contrary to the Eleventh Circuit's direction to consider the totality of the circumstances in analyzing the issue." *Id.* at *31. "In fact, the Supreme Court has explicitly distinguished detention of an individual while a search warrant is executed from the level of restraint associated with formal arrest." *Dix*, 2013 U.S. Dist. LEXIS 22476, at *16-17 (citing *Summers*, 452 U.S. at 697-98). Agents may secure a residence and its occupants to execute a search warrant without those occupants having their freedom of movement restrained to the degree associated with a formal arrest. *See, e.g.*, *Dix*, 2013 U.S. Dist. LEXIS 22476, at *17 ("[L]aw enforcement agents entering Dix's store with their weapons drawn, clearly announcing that they were the police and executing a search warrant, patting down and handcuffing Dix and Wise for security purposes, and escorting them outside the store . . ., were actions taken to ensure law enforcement's safety in connection

14

with executing the search warrant and fall short of the degree of restraint associated with formal arrest.")[6]; *United States v. Toumasian*, No. 1:10-CR-0291-TCB-JFK-3, 2011 U.S. Dist. LEXIS 93519, at *34 (N.D. Ga. July 19, 2011) ("The fact that Defendant was physically detained and handcuffed while the search warrant was executed does not necessitate a finding that Defendant was under arrest or in 'custody.' "), *adopted by* 2011 U.S. Dist. LEXIS 93516 (N.D. Ga. Aug. 22, 2011).

Plus the record shows after the initial sweep of the residence, the agents put away their weapons and removed the handcuffs from Defendant and his father. (Tr. 17-18, 68-69, 109). After that time no one pointed a weapon at any of the occupants of the house. No one told Defendant that he was under arrest, and he was never formally placed under arrest that day. Agents Westall and Scott asked Defendant if he would talk with them, and he agreed. They advised him at least twice, at the beginning of each interview, that he was not under arrest, that he was free to leave, and that he did not have to speak with the agents. (Tr. 70, 111-12, 122, 133-34, 136-37; Def. Ex. 1). No evidence suggests that Defendant ever asked

---

[6] One of the cases cited in *Dix* is *United States v. Calloway*, 298 F. Supp. 2d 39 (D.D.C. 2003), in which the court found "that the defendant was not in custody where five to ten officers, some in plain clothing with police vests and some in uniform, used force to breach the door to his residence, had their weapons drawn when entering and securing the residence, had the defendant lie face down on the floor where he was handcuffed while the residence was secured, and had defendant sit up-right against the wall, still handcuffed, in the living room while the search was being executed." *Dix*, 2013 U.S. Dist. LEXIS 22476, at *17-18.

to stop the interviews.  These circumstances support a conclusion that Defendant was not in custody while he was being interviewed.  *See Brown*, 441 F.3d at 1347 ("Unambiguously advising a defendant that he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the defendant is *not* in custody absent a finding of restraints that are so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview." (quotation omitted)); *United States v. Gorish*, No. 3:12-cr-156-J-34MCR, 2013 U.S. Dist. LEXIS 49592, at *17 (M.D. Fla. Jan. 18, 2013), ("Although '[n]o particular fact in the "custody" analysis is determinative,' the Eleventh Circuit has attached greater significance to whether the defendant was unambiguously advised that he was free to leave and was not in custody." (citing *Brown*, 441 F.3d at 1347-49)), *adopted by* 2013 U.S. Dist. LEXIS 49594 (M.D. Fla. Apr. 5, 2013).

The agents did not place the occupants "in custody" simply by preventing the occupants from moving about the house unsupervised.  Law enforcement personnel may accompany persons who are in an area being searched pursuant to a warrant without transforming the exchange into a custodial encounter.  *See, e.g.*, *United States v. Opoku*, 210 Fed. Appx. 848, 852 (11th Cir. 2006) (finding that the defendant was not in custody because, among other things, he "moved about his apartment during the entire interview, albeit under the agents' supervision as a

safety precaution").  Moreover, even if Defendant did not subjectively feel free to leave in spite of the agents' representations, "[t]he Supreme Court [has] clarified 'that the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody.' "  *United States v. Parker*, No. 1:10-CR-0176-JEC-JFK, 2010 U.S. Dist. LEXIS 133789, at *25 (N.D. Ga. Nov. 18, 2010) (quoting *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010)), *adopted by* 2010 U.S. Dist. LEXIS 133787 (N.D. Ga. Dec. 18, 2010); *see also Street*, 472 F.3d at 1309-10; *Dix*, 2013 U.S. Dist. LEXIS 22476, at *13 n. 15 (finding defendant's argument "that he was in custody for purposes of Miranda because a reasonable person in his situation would not have felt free to leave" to be insufficient to demonstrate that he was in custody, noting that the standards for a seizure under the Fourth Amendment are different from the standards for custody, which requires "restraint on freedom of movement to the degree associated with a formal arrest" (citations and quotations omitted)).[7]

The location of the interviews, i.e., in Defendants' daughters' bedroom in Defendant's residence, also supports a finding that Defendant was not in custody.

---

[7] At the beginning of the first interview, when the agents advised Defendant he was free to leave, Defendant laughingly responded, "I don't have anywhere to go." (*See* Gov't Ex. 2 at 2:40).  The agents again told him that he was not under arrest, and he did not have to speak with them.  At the beginning of the second interview, after the agents reiterated that he could leave at any time, etc., Defendant laughed and indicated that another agent would not let him leave to smoke; the agents confirmed that he was allowed to smoke and that no one had mistreated him or forced him to do anything.  (*See* Def. Ex. 1 at 00:14-1:00).

"The Eleventh Circuit recognizes that 'courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.' " *Asher*, 2010 U.S. Dist. LEXIS 112823, at \*17 (quoting *United States v. Gomes*, 279 Fed. Appx. 861, 868 (11th Cir. 2008)); *see also Brown*, 441 F.3d at 1348 ("Although the location of the interview is surely not dispositive in determining whether the interviewee was in custody, courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings."). Defendant complains about being interviewed in an "unfinished, small and dirty room with no windows"[8] (Doc. 32 at 23), in an apparent effort to liken his experience to an interrogation in a jail cell. But the room in question, no matter how spartan or untidy the accommodations may have been, was his *daughters' bedroom*, where presumably the girls were allowed to sleep and play. Furthermore, the agents offered a reasonable explanation for conducting the interview in the girls' bedroom. The room was located away from other areas of the house where the search was ongoing, and its contents appeared unlikely to fall within the scope of

---

[8] Defendant also notes that Agents Westall and Scott were standing during the interviews. (*See* Doc. 32 at 23). That fact does not demonstrate that the environment was coercive, in the absence of any evidence that the agents used their positions to intimidate or threaten Defendant or prevent him from being able to leave the room.

the warrant which authorized the seizure of computers, phones, and other electronic devices.  (*See* Tr. 97-98, 110).

Defendant also notes that he was separated and isolated from his family. (*See* Doc. 32 at 29).  Given the nature of the offense being investigated, i.e., child pornography involving images of his daughter, it was entirely reasonable that the agents chose to interview Defendant away from his family, including two persons the agents intended to interview, and in a location where the interview would not interfere with the search of the house.  In fact, agents questioned Defendant's father and his daughter in the same room.  (Tr. 101, 133).  Moreover, there is no evidence that Defendant asked to conduct the interview elsewhere, that he asked to speak with his family or to have his family members present during the interview, or that agents refused to allow him to speak with his family.[9]  Accordingly, "the Court does not find [Defendant's] characterization of the location for the interview to be persuasive evidence rendering [his] interview 'custodial interrogation.' " *Dix*, 2013 U.S. Dist. LEXIS 22476, at *23 (rejecting defendant's argument that he was in custody because the agents "isolated" him in their truck to interview him where the agent's "testimony makes clear that [the] truck was considered to be a comfortable place for all three men to speak together that would provide privacy from public scrutiny or stigma").

---

[9] At one point, Agent Westall observed Defendant in his mother's room, assisting her. (*See*  Tr. 135-36).

Finally, the undersigned finds that the recordings of the interviews (Gov't Ex. 2; Def. Ex. 1) do not show that Defendant was in custody.  As already discussed, the agents repeatedly advised Defendant that he was free to leave and did not have to speak with them.  Furthermore, the interviews did not last long, 25 minutes and 16 minutes, respectively.  Moreover, the recordings show that the agents did not harass or threaten Defendant such that he was subject to custodial interrogation.  During the first interview, the agents spoke with Defendant in a cordial, conversational tone, and no one threatened Defendant or made any promises in exchange for his statements.  (*See* Gov't Ex. 2).  During the second interview, it is true that for a couple of minutes in the middle of the interview, Agent Westall expressed annoyance with Defendant, indicated that he did not believe him, and accused him of using the email address under investigation and taking the picture or pictures at issue.  (*See* Def. Ex. 1).  Yet "the mere fact that an investigation has focused on a suspect does not trigger the need for Miranda warnings in noncustodial settings."   *Dix*, 2013 U.S. Dist. LEXIS 22476, at *14 (quotation omitted).

Citing *United States v. Jayyousi*, 657 F.3d 1085, 1110 (11th Cir. 2011), Defendant asserts that "[v]eiled and certainly direct accusations of guilt transform an otherwise peaceful, non-accusatory interview into a custodial cross-examination, requiring either cooperation or defense."  (Doc. 32 at 31).  In

*Jayyousi*, the court held that a detention became custodial at the point where the interviewing FBI agent accused the defendant of being linked to terrorist activities, the defendant "stood up and announced that the interview was over and it was time for him to go," and the agent told the defendant "if he did not assist the government, he would be served with a grand jury subpoena to compel his testimony in New York."  657 F.3d at 1110.  Thus, "any statements Padilla made after he was accused of participating in terrorist activities and before he received his *Miranda* warning would have been inadmissible."  *Id.*

The Eleventh Circuit recently rejected a defendant's reliance on *Jayyousi* by distinguishing that case.  In *United States v. Lazarus*, No. 12-16287, 2014 U.S. App. LEXIS 613 (11th Cir. Jan. 13, 2014), during the interview at issue, one of the agents accused the defendant of committing the credit card fraud: "Come on[ ].  It was you taking the credit card.  We know it's you.  You're the only person who's operating [the travel agency].  We know it's you using these credit cards."  *Id.* at *6.  The defendant relied on *Jayyousi* in contending "that this direct accusation during the interview transformed it into a custodial interrogation."  *Id.*  The court found that the defendant's reliance on *Jayyousi* was "misplaced" because the defendant's "case is materially different from *Jayyousi*."  *Id.* at *6-7.  The court explained:

> *Jayyousi* dealt with an airplane passenger who, after entering customs, was detained for hours by four armed FBI agents in an isolated,

> windowless conference room and who attempted to end the interview
> after the FBI agents accused him of being an al-Qaeda terrorist and
> then was arrested. 657 F.3d at 1109-11, 1127-29. None of those
> coercive circumstances existed in Lazarus's interview. Notably, even
> in those *Jayyousi* circumstances, we concluded that the interrogation
> became custodial only after the agents made the accusation and the
> defendant tried to leave. *Id.* at 1110.

*Id.* at *7. "Although the accusation marked the point at which the particular interrogation in *Jayyousi* became custodial, *Jayyousi* did not say that every time and officer makes an accusation, the interview becomes custodial." *Id.* "Moreover, the Supreme Court has instructed just the opposite." *Id.* "While an officer's suspicions regarding a suspect 'may bear upon the custody issue if they are conveyed' to the suspect, '[e]ven a clear statement from an officer that a person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest.' " *Id.* at *7-8 (quoting *Stansbury v. California*, 511 U.S. 318, 325 (1994)). "Rather, whether the interview is custodial depends on the totality of the circumstances, and '[t]he weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case.' " *Id.* (quoting *Stansbury*, 511 U.S. at 325).

The undersigned finds *Jayyousi* to be distinguishable from this case, and in the absence of other factors demonstrating that Defendant's freedom of movement was restrained to the degree associated with a formal arrest, Agent Westall's

threats and conditional accusations are insufficient to show that Defendant was in custody.[10]  *See, e.g.*, *United States v. Hampton*, No. 1:11-cr-00410-RWS-RGV, 2012 U.S. Dist. LEXIS 54421, at *52 (N.D. Ga. Mar. 5, 2012) (finding "unpersuasive" defendant's argument that she was in custody due to agent's "highly upset" and confrontational demeanor and accusations of obstruction and lying, "coupled with the fact that she was alone with [the agents] in the back parking lot in the evening after the encounter had already lasted about thirty minutes"), *adopted by* 2012 U.S. Dist. LEXIS 54411 (N.D. Ga. Apr. 17, 2012).

Defendant cites to several cases from other circuits holding that a defendant was in custody for purposes of *Miranda*, including *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008) and *United States v. Cavazos*, 668 F.3d 190 (5th Cir. 2012).  (*See* Doc. 32 at 17-25, 28-31 and n.8).  These cases do share factual similarities with this one.  Yet these other cases are "not controlling here." *Asher*, 2010 U.S. Dist. LEXIS 112823, at *19-20 (citing *OSI, Inc. v. United States*, 285 F.3d 947, 952 n.3 (11th Cir. 2002) ("[W]e are not bound by decisions of our sister circuits[.]").  The other circuits' consideration of factors contributing to the custody determination may differ from the Eleventh Circuit's.  As the *Asher* court explained

---

[10] After Agent Westall's brief contentious exchange with Defendant, the agents' interview returns to a calm, conversational tone.  (*See* Def. Ex. 1).

> In the Ninth Circuit, when an officer escorts a suspect around the house, the officer is restraining him, which favors a finding that the suspect is in custody. *Craighead*, 539 F.3d at 1085. In the Eleventh Circuit, when an officer merely follows a suspect around his house, the officer is not restraining him. *United States v. Opoku*, 210 F. App'x 848, 852 (11th Cir. 2006).

*Asher*, 2010 U.S. Dist. LEXIS 112823, at *20 n. 11.

Given the *totality* of the circumstances in this case, the undersigned finds that Defendant was not in custody. The following facts support that finding:

- following the initial entry into and clearing of the residence, Defendant was not restrained, nor were guns drawn or pointed at him;

- agents advised him repeatedly that he was free to leave, that he was not under arrest, and that he did not have to speak with them, and he appeared to have understood those statements;

- he was interviewed in familiar surroundings, i.e., his daughters' bedroom;

- he agreed to the interviews and never requested to terminate the interviews;

- the interviews were not lengthy, 25 and 16 minutes, for a total of 41 minutes;

- agents did not touch or threaten Defendant or make any promises in exchange for his statements; and

- Defendant was not arrested or taken into custody that day.

Several Eleventh Circuit cases, including district court cases, have found that defendants were not in custody based on many of these same factors. *See, e.g.*, *Brown*, 441 F.3d at 1347-49 (finding that defendant was not in custody when he was interviewed during the execution of a search warrant: "First, and most important, he was told no less than *three* times by two different officers that he was not under arrest, not in custody, and was free to go at any time"; the defendant "understood the officers' advice that he was not under arrest and was free to leave"; "he was in the familiar and comfortable surroundings of his girlfriend's home"; the defendant never sought to leave; he voluntarily spoke with the police; and he was free to move about the house, although "an officer accompanied him throughout the house for safety reasons.")[11]; *United States v. Matcovich*, 522 Fed. Appx. 850 (11th Cir. 2013) (affirming district court's determination that the defendant was not in custody based on the totality of the circumstances, including:

---

[11] The court also noted that the defendant was never handcuffed, and the interviewing agents were not armed, *id.* at 1349, which is not the case here, but as explained above, the fact that occupants are detained and even handcuffed during the execution of a search warrant does not render the detention custodial. Furthermore, Defendant was not handcuffed when the agents requested that Defendant speak with them, or during the interview, nor did the agents un-holster their weapons after their initial entry and sweep of the residence.

agents told defendant he was free to leave, was not in custody, and did not have to speak with the agents; agents interviewed him in his home; he was not physically restrained during the interview; the agents' weapons were holstered during the interview; he was free to move about the house, although accompanied by an agent for officer safety; the agent did not convey his suspicion that the defendant was a perpetrator[12]; and at the conclusion of the interview, the defendant was not arrested.)[13];  *Johnson*, 2013 U.S. Dist. LEXIS 108849, at *25-26, 60-61 (finding that defendant was not in custody where the interview took place near his residence; the defendant was never handcuffed or restrained during the interview; none of the officers brandished their weapons; and the agent explained why the officers were at the residence and told defendant he was not under arrest and was free to leave, although he could not enter residence during search); *Dix*, 2013 U.S Dist. LEXIS 22476, at *18-19 (finding that the defendant was not in custody when

---

[12] In this case, Agent Westall clearly communicated his suspicion that Defendant was the perpetrator, but for the reasons previously discussed, that factor is insufficient to indicate Defendant was in custody.  (*See supra*, at 21-24).

[13] In *Matcovich*, the court acknowledged that there were "factors that suggest the interview was custodial," including the fact that "when law enforcement officers entered [the defendant's residence] in order to execute the search warrant, there was a 'police-dominated atmosphere' with a number of officers handcuffing residents and bringing them to a central location"; the defendant was not allowed to retrieve his cigarettes, but instead an agent retrieved them for him; and defendant "was required to leave the door slightly open when using the bathroom." *Id.* at 852.  All of these were described "as being necessary for security reasons," and the court found that "these facts standing alone do not render this a custodial interrogation" in light of the other factors described above.  *Id.*

he was interviewed because the agents took off his handcuffs, "informed him that he could stay and watch the search, leave the premises, or stay and talk with law enforcement," told him "that he did not have to speak with law enforcement and was free to stop the interview at any time," and did not draw their weapons or touch or physically intimidate the defendant, and the defendant "never asked to stop the interview or to leave the premises")[14]; *United States v. Votrobek*, No. 4:11-CR-022-RLV-WEJ, 2012 U.S. Dist. LEXIS 185962, at *15, 31-34 (N.D. Ga. June

---

[14] The facts of *Dix* are very similar to those in this one.  In that case, approximately 18 law enforcement officers, including federal, state, and local agents and officers executed a federal search warrant at the defendant's business. 2013 U.S. Dist. LEXIS 22476, at *2.  Members of the police department, "who were wearing civilian clothing, body armor, and jackets or badges identifying themselves as law enforcement, entered the store with their weapons drawn, announcing that they were the police and that they were executing a search warrant."  *Id.* at *4.  They handcuffed the defendant and another employee to secure the premises, and took them out of the store "and turned them over to the federal agents outside."  *Id.* Agents un-handcuffed the defendant, explained that they were there to execute the search warrant, and offered the defendant three choices: (1) he could stand around and watch, but not interfere with the search; (2) he could leave; or (3) he could sit down and talk with the agents.  *Id.* at *5.  The defendant agreed to talk with the agents, and they interviewed the defendant in one of the agents' trucks, with the doors shut and windows rolled up, for approximately an hour and a half.  *Id.* at *6. The defendant was not handcuffed during the interview, and the agents advised him that "he was free to stop talking or leave at any time."  *Id.*  During the interview, after obtaining background information from the defendant, the agents questioned him about the allegations under investigation, i.e., whether he had bought WIC vouchers with cash, and told the defendant they had video evidence contradicting his denials, after which the defendant admitted the allegations.  *Id.* at *6-7 n.10.  The court rejected the defendant's argument, similar to Defendant's argument in this case, that he was in custody due to "the fact that there were numerous officers with weapons drawn executing the search warrant who placed him in handcuffs and took him outside the store into the parking lot."  *Id.* at *16.

25, 2012) (finding that the defendant was not in custody when interviewed during the execution of a search warrant at his clinic because "[a]t no time during that interview did the agents tell [defendant] that he had to stay at AMG, or threaten, shout at, or display a firearm to him"; "[n]one of the agents made any promises to [him], nor did they place him in handcuffs, arrest him, or touch him after the initial pat down, except to shake his hand"; and the interview was not lengthy, lasting approximately an hour)[15], *adopted by* 2013 U.S. Dist. LEXIS 9326 (N.D. Ga. Jan. 23, 2013); *Toumasian*, 2011 U.S. Dist. LEXIS 93516, at *11 (finding that the defendant was not in custody because he "did not ask to leave the apartment; the detective used a conversational tone; and the officers never drew their guns during questioning")[16]; *Asher*, 2010 U.S. Dist. LEXIS 112823, at *18-19 (finding that

---

[15] In *Votrobek*, a search team of more than 12 officers arrived to execute a search warrant at defendant's clinic, and six entered the premises with guns drawn, wearing tactical vests emblazoned with "DTF Agent/Police," directing the occupants to show their hands, and announcing "police, search warrant." 2012 U.S. Dist. LEXIS at *6-7. After the premises were cleared, the agents holstered their weapons and escorted patrons outside. *Id.* Agents remained outside the clinic office and observed the defendant when the interviewing agent had to leave, and agents monitored the defendant's calls via a wiretap. *Id.* at *11-12 and n.11. The interviewing agents told defendant he was not under arrest and that the interview was free and voluntary, but did not tell defendant he was free to leave. *Id.* at *12. Agents also told defendant they had been investigating the clinic for a year and were executing other search warrants that day, including defendant's apartment. *Id.* at *13.

[16] In *Toumasian*, officers executing search warrants at an apartment forced open the door when no one answered, 5 to 10 officers entered the apartment with guns drawn, and handcuffed the occupants, including the defendant, while they were lying face down on the floor. 2011 U.S. Dist. LEXIS 93519 at *5 and n.3. The

defendant was not in custody where the defendant was interviewed during the execution of a search warrant in his home because he was free to move about the residence, although "accompanied by an officer"; he was not physically restrained during the interview, and the officers did not touch him other than grabbing him when the defendant became aggressive after which defendant "calmed down"; defendant was repeatedly told he was not under arrest; and but for a brief heated exchange, the interview was conducted in a conversational tone).

Having considered the totality of the circumstances, the undersigned finds that Defendant has not met his burden of showing that his freedom of movement was restrained to the degree associated with a formal arrest. Because Defendant was not in custody when Agents Westall and Scott questioned him, they were not required to advise him of his rights under *Miranda*. The undersigned therefore **RECOMMENDS** that Defendant's motion to suppress his statements on the ground that the agents failed to advise him of his *Miranda* rights be **DENIED**.

## II.     <u>Were Defendant's Statements Made Voluntarily?</u>

Having determined that Defendant's statements were not the product of custodial interrogation, the undersigned must still determine whether they were made voluntarily. *See United States v. Nelson*, No. CR612-005, 2012 U.S. Dist.

---

officers then holstered their weapons, and while the defendant was handcuffed, one of the detectives asked him who lived in the apartment, to which he responded that he did. *Id.* at *6.

LEXIS 103944, at *12 (S.D. Ga. July 25, 2012) ("Even noncustodial statements, however, are subject to challenge on the ground that they were not voluntarily made."), *adopted by* 2012 U.S. Dist. LEXIS 125395 (S.D Ga. Sept. 4, 2012). "Aside from the mandates of Miranda, whether a statement was voluntarily given must be examined in light of the totality of the circumstances." *Hampton*, 2012 U.S. Dist. LEXIS 54421, at *56-57. "This totality of circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of an essentially free and unconstrained choice." *Id.* (quotations omitted). "Among the factors [the Court] must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003); *see also Harris v. Dugger*, 874 F.2d 756, 761 (11th Cir. 1989) (explaining that a statement is not given voluntarily if it is "extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence"). " 'Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.' " *Nelson*, 2012 U.S. Dist. LEXIS 103944, at *12 (quoting *United States v. Thompson*, 422 F.3d 1285, 1296-96 (11th Cir. 2005)).

Defendant argues that his statements were involuntary because they were "the product of a false promise of exoneration and deception."  (Doc. 32 at 34). Specifically, he contends that Agent Westall "promised [him] that he could 'clear' himself by taking a polygraph," and made a "deal" with Defendant, i.e., "if he takes it and passes it, he will refocus his attention elsewhere."  (Doc. 32 at 36). Defendant asserts that "[h]e was promised no charges, i.e., that he would be 'cleared' if he passed a polygraph that morning."  (*Id.* at 37).  The undersigned disagrees.

During the first interview, Agent Westall asked Defendant if he would be willing to take a polygraph that morning, and Defendant said he would.  (Gov't Ex. 2 at 10:12-10:15).  Defendant then asked what his rights were with respect to the polygraph, and Westall told him he did not have to take one.  (*Id.* at 10:15-10:22). Defendant also asked if a polygraph is "100%," and Westall responded, "It would clear you in my mind if you tell me that you didn't take the picture and you pass a polygraph."  (*Id.* at 10:22-10:32).   Defendant again stated he would take the polygraph.  (*Id.* at 10:32-10:34).  During the second interview, Defendant repeated that he was willing to take a polygraph (Def. Ex. 1 at 13:38), and asked again if that test is "100% right."  (*Id.* at 13:48-13:49, 14:00-14:01).  Westall responded that it is "freaking damn accurate," that "nothing is 100 %," but "if you're willing to take it . . ., it would refocus our attention someplace else."  (*Id.* at 14:06-14:18).

31

Defendant instructed the agents to "schedule it . . ., pick me up wherever and take me there, deal?" to which Westall respond, "deal." (*Id.* at 14:38-14:45).

Defendant relies upon a Sixth Circuit case to advance his argument that any statements after that point would not have been voluntary.  In particular, the case relied upon by Defendant found statements were not voluntary once the Defendant was told that she must either answer questions or be formally charged. *Williams v. Withrow*, 944 F.2d 284, 286 (6th Cir. 1991) *aff'd in part, rev'd in part*, 507 U.S. 680 (1993).  It is worth noting that in *Williams* the defendant was placed in an unmarked police car, transported to the police station, and "given the choice of cooperating with the police or going to jail." *Id.* at 289.   Under these circumstances, the *Williams* court found later statements made after a *Miranda* warning were not voluntary based on a review of the "entire course of police conduct." *Id.*

The undersigned need not decide whether the parties reached an agreement to have Defendant perform a polygraph.  It is undisputed that no such test was administered.   Any putative agreement did not induce Defendant to make statements after the completion of the so-called "deal."  Defendant's statements in the interview were consistent both prior to and after the discussion of the polygraph test.  Throughout the interview he steadfastly denied involvement in the activity that resulted in the search.  Under these circumstances, the alleged "deal"

32

to take a polygraph can not be said to have caused Defendant to have been coerced into involuntarily making any statements.

Thus, for many of the same reasons discussed above in finding that Defendant was not in custody, the undersigned finds that Defendant's statements were voluntary.  In particular, the agents did not handcuff or restrain Defendant during the interviews; they did not display their weapons during the interviews; they informed Defendant repeatedly that he was free to leave and that he did not have to speak with the agents; Defendant agreed to speak with them and did not ask to stop the interviews; and the interviews were not lengthy, totaling less than an hour.  Furthermore, the recordings of Defendant's interviews show that he was able to understand and communicate with the agents, and the agents did not use force against Defendant, threaten him, or make any promises[17] to him in order to obtain his statements.  *See, e.g.*, *Gorish*, 2013 U.S. Dist. LEXIS 49592, at *19 (finding statements voluntary for same reasons court found that defendant was not in custody and also because "there were no threats or promises made," and defendant's "answers seemed to be coherent and responsive to the questions asked and the agents did not suspect him to be impaired in any way"); *Nelson*, 2012 U.S.

---

[17] Again, the supposed "deal" to take a polygraph cannot be said to have caused Defendant to make any statements involuntarily where Defendant's statements after the "deal" in question were consistent with statements before the potential agreement.  Had the Defendant only begun talking after the alleged deal or if he had materially changed his position after the discussion of the polygraph, then that would present a different question.

Dist. LEXIS 103944, at *13 (finding defendant's statements to be voluntary where there was no evidence that agents used or threatened force against him during the two-hour interview, browbeat or intimidated him, or promised him any benefit, and there was no evidence of diminished capacity); *Hampton*, 2012 U.S. Dist. LEXIS 54421, at *59-60 (finding that defendant's statements were made voluntarily where there was no evidence agents threatened her or applied force to her; she was not handcuffed or restrained; agents made no promises or inducements to obtain the statements; the encounter took place in a familiar environment; and defendant "never showed a desire to end the questioning and never indicated that she did not understand the questions she was being asked").

Because Defendant's statements to Agents Westall and Scott were made voluntarily, it is **RECOMMENDED** that Defendant's motion to suppress his statements on the ground that they were involuntary be **DENIED**.

### Summary

It is **RECOMMENDED** that Defendant's motion to suppress his statements (Doc. 11) be **DENIED**.

It is further **ORDERED** that subject to a ruling by the District Judge on any objections to orders or recommendations of the undersigned Magistrate Judge, this case is **certified ready for trial**.

**IT IS SO ORDERED, REPORTED AND RECOMMENDED** this <u>6th</u>

day of <u>March</u> 2014.

        <u>/s/  J. CLAY FULLER</u>
        J. CLAY FULLER
        United States Magistrate Judge